WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tracy Allen Hampton,<br><br>             Petitioner,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>             Respondents. | No. CV-14-2504-PHX-ROS<br><br>**DEATH PENALTY CASE**<br><br>**ORDER** |

Before the Court is Petitioner Tracy Hampton's motion for an order staying and holding in abeyance these habeas proceedings. (Doc. 56.) Hampton is an Arizona death row prisoner. He filed an amended habeas petition on January 29, 2016. (Doc. 40.)

In the pending motion, Hampton seeks a stay so that he can return to state court and exhaust Claims 1 and 2. (Doc. 56.) Respondents filed a response in opposition and Hampton filed a reply. (Docs. 57, 58.) For the reasons set forth herein, the motion is denied.

## BACKGROUND

In 2002, a jury convicted Petitioner of two counts of first-degree murder and one count of manslaughter, for shooting to death a man and a pregnant woman and the resulting death of the unborn child. A jury sentenced him to death on the murder convictions. The Arizona Supreme Court, in its opinion affirming the convictions and sentences, set forth the following facts:

> On May 16, 2001, Department of Public Safety officers attempted to serve a traffic ticket on Tracy Allen Hampton. The officers went to a house

on East Roberts Road in Phoenix, where Hampton had been staying with Charles Findley and Findley's girlfriend, Tanya Ramsdell, who was five months pregnant. Hampton was not there, but Findley and Ramsdell were. To prove that he was not the man the officers were looking for, Findley showed them a photograph of Hampton, and the officers left.

Early the next day, Misty Ross and Shaun Geeslin went to the house on East Roberts Road. Hampton let them in; he told them of the police visit and his intention to confront Findley about the incident. When Findley awoke, Hampton argued with him.

Later during the morning of May 17, Hampton, Findley, Ross, Geeslin and several others smoked methamphetamine. Sometime after 10:30 a.m., Hampton and Geeslin left. The two returned near noon and entered a back room where Findley was kneeling on the floor working on a lighter. Hampton turned on a CD player to a loud volume, walked in front of Findley, and called out his name. As Findley looked up, Hampton shot him in the forehead, killing him. Geeslin and Ross then walked to the front door.

Hampton began following Ross and Geeslin, but stopped and said something like, "Wait, we have one more." He then went to a bedroom where Ramsdell was sleeping and opened the door. Ramsdell told Hampton to get out, and Hampton shot her in the head. Ramsdell and her unborn child died as a result.

. . . .

Hampton was arrested on May 31, 2001. While awaiting trial in the Maricopa County jail in August 2001, Hampton shared a cell with George Ridley. Ridley testified at trial that Hampton admitted to committing the murders and told him the story of the murders every night for two weeks. Hampton told Ridley that he killed Findley because "he was a rat" and he killed Ramsdell because Hampton was affiliated with the Aryan Brotherhood and thought that Ramsdell was a "nigger lover" who was pregnant with a Black man's child. Hampton also told Ridley that he "thought it was funny" that Ramsdell had slept through the shooting of her boyfriend, and "bragged about the fact he was able to shoot [Ramsdell] in pretty much the same place he shot her old man." Ridley also said that before leaving the house, Hampton knelt down next to Findley's body and whispered in his ear, "I want to let you know I took care of your nigger

> loving old lady and her little coon baby, too. Don't worry, they didn't feel a thing."

*State v. Hampton*, 213 Ariz. 167, 171–72, 140 P.3d 950, 954–55 (2006).

## **APPLICABLE LAW**

A federal court may not "adjudicate mixed petitions for habeas corpus, that is, petitions containing both exhausted and unexhausted claims." *Rhines v. Weber*, 544 U.S. 269, 273 (2005) (citing *Rose v. Lundy*, 455 U.S. 509, 518–519 (1982)). In *Rhines*, however, the Supreme Court held that "a federal district court has discretion to stay [a] mixed petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition." *Id*. at 271–72. This discretion is to be exercised under "limited circumstances," *id*. at 277, because "routinely granting stays would undermine the AEDPA's goals of encouraging finality and streamlining federal habeas proceedings."[1] *Blake v. Baker*, 745 F.3d 977, 981–82 (9th Cir. 2014).

The stay-and-abeyance procedure is appropriate only where the habeas petitioner has shown: (1) "good cause" for his failure to exhaust; (2) the unexhausted claim is "potentially meritorious"; and (3) he did not "engage[] in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 277–78. "[G]ood cause turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence, to justify" the failure to exhaust the claim in state court. *Blake*, 745 F.3d at 982. However, "even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Rhines*, 544 U.S. at 277–78.

## **DISCUSSION**

---

[1] Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. 2254.

Hampton seeks a stay so that he can return to state court and exhaust Claims 1 and 2 of his amended habeas petition. The stay-and-abeyance process is not appropriate for either claim.

1. **Claim 1**

Hampton alleges that he is actually innocent of the crimes. (Doc. 40 at 19.) He asserts that Misty Ross and George Ridley lied in their trial testimony and that an alternative suspect, Tim Wallace, had a motive to kill Findley and told friends he had committed the murders. (*See id.* at 19–20.)

Hampton contends that good cause exists for his failure to exhaust Claim 1 because post-conviction relief (PCR) counsel performed ineffectively by failing to investigate Ridley and because the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose impeachment evidence about Ridley. (Doc. 56 at 4.) Respondents contend that the claim is not cognizable on federal habeas review, that Hampton has not demonstrated good cause for failing to exhaust the claim, and that the claim is plainly meritless. (Doc. 57 at 3.)

As Respondents note, the Supreme Court has not yet recognized actual innocence as grounds for habeas relief absent an independent constitutional violation in the underlying state criminal proceedings. *Herrera v. Collins*, 506 U.S. 390, 400–401 (1993); *see House v. Bell*, 547 U.S. 518, 555 (2006) (declining to resolve the open question of whether freestanding actual innocence claims are possible). In *Herrera*, the Court explained that its body of "habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404; *see Schlup v. Delo*, 513 U.S. 298, 313–15(1995) (distinguishing procedural claims of innocence from substantive claims of innocence, and holding that a claim of actual innocence may be raised to avoid a procedural bar to consideration of the merits of a petitioner's constitutional claims).

- 4 -

The Ninth Circuit has noted that a majority of the Justices in *Herrera* would have supported a claim of free-standing innocence. *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000). The court has emphasized, however, that the standard for establishing a freestanding claim of actual innocence is "'extraordinarily high' and . . . the showing [for a successful claim] would have to be 'truly persuasive.'" *Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir. 1997) (quoting *Herrera,* 506 U.S. at 417).

"Evidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence." *Jones v. Taylor*, 763 F.3d 1242, 1251 (9th Cir. 2014). At a minimum, the petitioner must "go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* (citing *Herrera*, 506 U.S. at 442–44 (Blackmun, J., dissenting)). That is, he must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 327); *see McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The new evidence must be reliable, and the reviewing court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 332.

Given these high standards, even if Hampton's free-standing actual innocence claim were cognizable, it is plainly meritless. Hampton has not persuaded this Court "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Perkins*, 133 S. Ct. at 1928.

Hampton alleges that in speaking with friends Misty Ross gave inconsistent accounts of what she witnessed and these accounts contradicted her trial testimony. (Doc. 40 at 35–37.) For example, Jennifer Doerr stated that Ross told her Hampton did not

- 5 -

commit the murders and that Ross did not know who did. (*See* Doc. 42-9, Ex. 298 at ¶4.) Doerr noted other inconsistencies in the version of events related to her by Ross. (*See* Doc. 43-3, Ex. 324 at ¶3; Ex. 325 at ¶2.) Hampton argues that "[g]iven these numerous and inconsistent versions of what occurred, Ross's testimony at trial cannot be trusted." (Doc. 40 at 45.)

Hampton also contends that George Ridley's testimony was unreliable and that there is evidence Ridley lied. (Doc. 40 at 37–44.) Hampton alleges that Ridley read the police reports from Hampton's case while they shared a cell and then lied about hearing Hampton confess to the details of the murders. (*Id.* at 43; *see* Doc. 42-8, Ex. 294.) Ridley's ex-wife told Hampton's investigator that Ridley told her that he had gone through Hampton's legal documents. (*See* Doc. 43-3, Ex. 328 at ¶¶2, 4, 6.)

Finally, in support of his actual innocence argument, Hampton proposes an alternative suspect, Tim Wallace. According to Hampton, Wallace had a motive to kill Findley because Wallace, a drug dealer, believed Findley was a snitch. (Doc. 40 at 45.) Hampton also alleges that Wallace confessed to multiple people that he killed Findley and Ramsdell. (*Id.* at 32, 46.)

These arguments are not persuasive. First, much of this information is not "new evidence" but was available at the time of Hampton's trial. For example, the defense investigator interviewed Doerr, who recounted Misty Ross's inconsistent statements. (Doc. 51-2 at 228; *see* Doc. 42-9, Ex. 298) The investigator also interviewed witnesses who reported that Wallace confessed to the murders. (Doc. 51-1 at 359, 590.) At trial, defense counsel called Mark Sandon, a friend of Hampton's, who testified that Wallace confessed to the murders. (RT 5/1/02 at 34, 53.)[2]

In addition, Ridley was extensively cross-examined about his prior felonies as well as his plea agreement with the state and his pending sentence. (RT 4/30/02 at 105–21.) He was also questioned about having access to Hampton's legal documents in the cell

---

[2] "RT" refers to the court reporter's transcripts.

- 6 -

they shared. (*Id.* at 96–100.) Furthermore, defense counsel presented testimony from an attorney who visited Hampton at the jail and gave him a police report and other papers. (RT 5/1/02 at 9–11.)

Second, the new evidence Hampton cites is not sufficient to support a freestanding claim of actual innocence. Courts have consistently rejected actual innocence claims based on similar evidence.

In *Herrera,* the petitioner alleged he was actually innocent of capital murder and that his brother Raul—who had died two years after the murders were committed—had killed the victims. *Herrera*, 506 U.S. at 396–97. To support this claim, the petitioner submitted affidavits from Raul's former attorney and one of Raul's former cellmates, both of whom stated Raul told them that he, and not Petitioner, had killed the victims. *Id.* Additionally, the petitioner proffered an affidavit from Raul's son, who stated that he witnessed Raul shoot the victims and that the petitioner was not present, as well as an affidavit from a schoolmate of the petitioner and Raul who stated that Raul had admitted shooting the victims. *Id.* at 397. The Supreme Court held that even assuming that a "truly persuasive demonstration of 'actual innocence'" might entitle a habeas corpus petitioner to relief in a capital case, the showing the petitioner made "falls far short" of the "extraordinarily high" threshold necessary to support such a claim. *Id.* at 417–19.

In *House,* a jury convicted the petitioner of murder and sentenced him to death. 547 U.S. at 521. The petitioner subsequently presented new DNA evidence that semen found on the victim's nightgown and panties came from the victim's husband and not the petitioner, which contradicted the only forensic evidence at the scene linking the petitioner to the murder and negated the prosecutor's theory of motive. *Id.* at 540–41. The petitioner also presented new evidence that blood found on his jeans could not have come from the victim while she was alive, but instead might have gotten on the jeans when they were transported to the FBI along with improperly sealed samples of the victim's blood that spilled during transit. *Id.* at 542–48. Additionally, the petitioner presented "troubling evidence" that the victim's husband could have been the murderer. *Id.* at 548–

53. Two witnesses described a confession by the victim's husband, two other witnesses described his suspicious behavior around the time of the crime, and additional witnesses described a history of abuse. *Id.* at 551. The Supreme Court found that although the evidence was sufficient to allow consideration of Petitioner's procedurally defaulted claims, it was insufficient to meet the "extraordinarily high" threshold for a freestanding innocence claim, assuming such a claim existed. *Id.* at 555 (explaining that "whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it.").

In *Carriger*, the petitioner was sentenced to death for a murder committed during a robbery. 132 F.3d at 465. Nine years later, the chief prosecution witness, who testified under immunity that the petitioner had confessed the crime to him immediately after it happened, admitted he had set the petitioner up, and he accurately described details about the crime and the crime scene that only a participant could have known. *Id.* at 467, 478–79. The Ninth Circuit rejected the petitioner's freestanding actual innocence claim given the contradictions in the witness's story and his history of lying and because the petitioner had "presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor [was] there any new and reliable physical evidence, such as DNA, that would preclude any possibility of [the petitioner's] guilt." *Id.* at 477.

Hampton has not offered "new reliable evidence" of his innocence. *Schlup*, 513 U.S. at 324. The evidence does not affirmatively prove that he is more likely than not innocent of the murders and that no reasonable juror would have found him guilty beyond a reasonable doubt. *See House*, 547 U.S. at 537. Hampton has offered no new evidence that would preclude the possibility of his guilt. *Carriger*, 132 F.3d 477. At most the new evidence undercuts the trial testimony of Misty Ross and George Ridley, *Jones*, 763 F.3d at 1251, but it does so in a way that is cumulative to the impeachment evidence in Hampton's possession at the time of trial.

Hampton's allegation of actual innocence are not potentially meritorious. Because Claim 1 is plainly meritless, Hampton is not entitled to a stay.

- 8 -

**2. Claim 2**

Claim 2 alleges that the State violated *Brady* by failing to disclose Ridley's 2002 presentence report. (Doc. 40 at 55–65.) Hampton asserts that the State's alleged *Brady* violation and PCR counsel's failure to investigate Ridley establishes "good cause" under *Rhines* and that the claim is colorable. For the reasons set forth below, Hampton is not entitled to a stay on this claim.

In the presentence report, completed in connection with Ridley's 1999 theft and 2001 stalking charges, Ridley's ex-wife is quoted as saying, in reference to Ridley's testimony at Hampton's murder trial, that Ridley's "recollection of events should be questioned" and that she "does not believe he knows much of anything regarding the case." (Doc. 42-8, Ex. 297 at 3.) She also is quoted as stating that Ridley was "very savvy and someone who will say and do whatever is necessary to secure himself a good deal." (*Id.*) In addition, the probation officer who wrote the report stated that Ridley would "say or do just about anything to secure a positive outcome for himself." (*Id.* at 5.)

Hampton's trial counsel have submitted affidavits stating they were provided a copy of Ridley's criminal file but not the 2002 presentence report. (Doc. 49-2, Ex. 302, ¶¶ 6–9; Ex. 303, ¶ 7–9.) Counsel further state they had no strategic reason not to request the report. (*Id.*, ¶ 8; Ex. 303, ¶ 9.) PCR counsel admits he did have a copy of the report but "simply overlooked it." (*Id.*, Ex. 304, ¶ 4.)

Respondents contend that Hampton cannot demonstrate "good cause" for his failure to exhaust Claim 2 because there was no *Brady* violation. (Doc. 51 at 49–51.) They assert that Ridley's 2002 presentence report did not constitute *Brady* evidence because it was not suppressed by the State and was not exculpatory or material. They also argue that if the presentence report contained favorable impeachment evidence, this information was cumulative to Ridley's testimony. For the same reasons, Respondents contend that Claim 2 is not potentially meritorious. (Doc. 51 at 33–52.)

Finally, Respondents contend that Claim 2 would be precluded in a successive PCR petition under Arizona Rules of Criminal Procedure 32.2(a)(1) and (3), and 32.4(a)

- 9 -

because it could have been raised on direct appeal or in Hampton's previous PCR petition. The Court agrees that Hampton could have raised this claim during PCR proceedings, when counsel had a copy of the presentence report.

Under Ariz. R. Crim. P. 32.2(a), a defendant is precluded from raising any claims that could have been raised during prior proceedings, were already adjudicated, or have been waived. *See* Rule 32.2(a)(3) (precluding any claim that could have been brought on direct appeal or in a prior PCR petition.). However, there are exceptions to Rule 32.2(a). As Hampton notes, the rule does not apply if "[t]he defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found the defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty." Ariz. R. Crim. P. 32.1(h).

The facts underlying Hampton's *Brady* claim are not "sufficient to establish that no reasonable fact-finder would have found the defendant guilty of the underlying offense beyond a reasonable doubt."[3]

Respondents argue that the presentence report did not contain admissible impeachment evidence and was not material because Ridley was impeached on the same grounds during cross-examination. The Court agrees.

The impeachment information in the presentence report was cumulative to the evidence used to impeach Ridley during his testimony. The jury was aware that Ridley had convictions for stalking, drug possession, and theft. The jury was also informed that Ridley had received a favorable plea agreement for his testimony in Hampton's case.

Ridley, testifying in his jail clothes, admitted on direct examination that he was presently incarcerated for a felony conviction. (RT 4/30/02 at 73.) He agreed that a plea

---

[3] To succeed on a *Brady* claim, a petitioner must establish that the evidence was (1) favorable to the accused, either as exculpatory or impeachment evidence; (2) suppressed by the State, either willfully or inadvertently; and (3) material, so that prejudice resulted from its suppression. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

- 10 -

agreement was involved in his decision to testify in Hampton's case. (*Id.* at 74–75.) He conceded that he was facing a lot of prison time and that he contacted the police, in part, because he wanted to minimize his time in custody. (*Id.* at 105–06.) Ridley admitted that he had been previously convicted of at least three felonies. (*Id.* at 97, 106.) He was convicted twice of possession of dangerous drugs for sale. (*Id.* at 107.) In 1998 he was convicted of stalking, and in 2001 he was in jail on a different felony stalking charge. (*Id.* at 107– 08.)

      Ridley was cross-examined extensively about the possible sentences he faced with his prior felony convictions absent a favorable plea agreement. (*Id.* at 108–11.) Ridley testified that he contacted the police as soon as he was moved out of the cell he shared with Hampton, told them he had information on a murder, and talked to them about "working out and resolving [his] problems." (*Id.* at 112–14.) Ridley testified that he knew the information he provided would "affect what [he] got as a deal," and that the deal he did get was "considerably better than the six-and-a-half years that [he] was facing before [he] even got the stalking charge." (*Id.* at 115–16.) According to the agreement, Ridley would plead to the Class 3 felony for theft, as if he had no prior felonies, and the Class 5 felony for stalking; he would get probation for the Class 5 felony, which would not have occurred without a deal. (*Id.* at 116–17, 127.) With this written agreement, Ridley's possible sentence was "probation to nine years." (*Id.* at 117, 127.) The State's recommendation on the sentence was withheld until Ridley testified in Hampton's case. (*Id.* at 119.) Ridley admitted that if he had gone to trial on the Class 5 felony charge, he was prepared "to testify and say whatever it took to be found not guilty." (*Id.*)

      Undisclosed impeachment evidence is not material where it is "duplicative of impeachment already pursued at trial." *Schad v. Ryan*, 671 F.3d 708, 715 (9th Cir. 2011), *on reconsideration,* No. 07-99005, 2013 WL 791610 (9th Cir. Feb. 26, 2013), *cert. granted, judgment rev'd,* 133 S. Ct. 2548 (2013), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015). In *Schad*, the State failed to disclose letters written to a key witness by a prosecutor and a detective, which promised to help

the witness in an unrelated criminal matter. 671 F.3d at 714. The Ninth Circuit found that Schad was not prejudiced because the letters did not provide a new, independent basis to impeach the witness. *Id.* at 716. Even without the undisclosed letters, the jury was aware of the witness's incentive to lie, and the witness was thoroughly impeached with his criminal record. *Id.* Similarly, in *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005), the court found that the prosecution's failure to disclose evidence of a witness's four prior convictions was not prejudicial because the undisclosed evidence was duplicative of impeachment already pursued at trial. The evidence would not have "provide[d] 'the defense with a new and different ground of impeachment.'" *Id.* at 1097 (additional quote omitted). "Even absent the withheld evidence, [the witness] was thoroughly impeached and showcased as a self-serving jailhouse snitch." *Id.*; *see Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) ("Suppressed impeachment evidence is immaterial under *Brady,* however, if the evidence is cumulative or impeaches on a collateral issue."); *United States v. Sipe*, 388 F.3d 471, 489 n.49 (5th Cir. 2004)("Evidence that impeaches an already thoroughly impeached witness is the definition of 'cumulative impeachment' evidence and its suppression cannot give rise to a *Brady* violation.").

Ridley's presentence report contained cumulative evidence. It did not provide new or different grounds for impeaching Ridley. Because the report contained only duplicative impeachment evidence challenging Ridley's incentive for testifying against Hampton and his overall credibility, Hampton was not prejudiced by the State's alleged failure to disclose the report.

Hampton has failed to demonstrate by clear and convincing evidence that the facts underlying his *Brady* claim would be sufficient to establish that no reasonable fact-finder would have found him guilty of the murders. Ariz. R. Crim. P. 32.1(h). The evidence in the presentence report also fails to show actual innocence. "Latter-day impeachment evidence seldom, if ever, makes a clear and convincing showing that no reasonable juror would have believed the heart of the witness' account." *Sawyer v. Whitley*, 505 U.S. 333, 334 (1992); *see Calderon v. Thompson*, 523 U.S. 538, 565–66 (1998) (noting that newly

discovered impeachment evidence, which is "a step removed from evidence pertaining to the crime itself," "provides no basis for finding" actual innocence); *McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013).

Claim 2 is not subject to Rule 32.1(h) and is precluded under Rule 32.2(a)(2). Hampton is not entitled to a stay.

## **CONCLUSION**

**IT IS ORDERED DENYING** Hampton's Motion for Stay and Abeyance (Doc. 56).

Dated this 8th day of July, 2016.

Honorable Roslyn O. Silver
Senior United States District Judge

- 13 -