1    WO

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

9    Tracy Allen Hampton,                 No. CV-14-02504-PHX-ROS

10                    Petitioner,          DEATH PENALTY CASE

11   v.                                    **ORDER**

12   Charles L. Ryan, et al.,

13                    Respondents.

15          Before the Court is Petitioner Tracy Allen Hampton's amended petition for writ of

16   habeas corpus.  (Doc. 40.)[1] Respondents filed a response and Petitioner filed a reply.

17   (Docs. 51, 68.)  Petitioner also filed a motion for evidentiary development (Doc. 73), which

18   has been fully briefed (Docs. 76, 77).  The Court rules as follows.

19   **I.      BACKGROUND**

20          In 2002, a jury convicted Petitioner of two counts of first-degree murder and one

21   count of manslaughter and sentenced him to death.  The following factual summary is taken

22   from the opinion of the Arizona Supreme Court affirming the convictions and death

23   sentence, *State v. Hampton*, 213 Ariz. 167, 140 P.3d 950 (2006), and a review of the state

24   court record.

25          On May 16, 2001, Department of Public Safety officers attempted to serve a traffic

26   ticket on Tracy Allen Hampton. The officers went to a house on East Roberts Road in

28          _____
            [1]  These citations refer to the document and page numbers generated by the Court's
     Case Management/Electronic Case Filing system.

Phoenix, where Hampton had been staying with Charles Findley and Tanya Ramsdell. Ramsdell was approximately five months pregnant at the time. When the officers arrived, Hampton was not there, but Findley showed the officers a photograph of Hampton, and the officers left.

Early the next day, Misty Ross and Shaun Geeslin went to the house on East Roberts Road. Hampton let them in, and Hampton, Findley, Ross, Geeslin and several others smoked methamphetamine throughout the morning. Sometime after 10:30 a.m., Hampton and Geeslin left. The two returned near noon and entered a back room where Findley was kneeling on the floor working on a lighter. Hampton walked over to Findley and called out his name. As Findley looked up, Hampton shot him in the forehead, killing him. Geeslin and Ross then walked to the front door.

Hampton began following Geeslin and Ross, but stopped and said something like, "Wait, we have one more." He then went to a bedroom where Ramsdell was sleeping and opened the door. Ramsdell told Hampton to get out, and Hampton shot her in the head. Ramsdell and her unborn child died as a result.

Hampton was arrested on May 31, 2001. While awaiting trial in the Maricopa County jail in August 2001, Hampton shared a cell with George Ridley. Ridley testified at trial that Hampton admitted to committing the murders and told him the story of the murders every night for two weeks. Hampton told Ridley that he killed Findley because "he was a rat" and he killed Ramsdell because Hampton was affiliated with the Aryan Brotherhood and thought that Ramsdell was pregnant with a Black man's child. Ridley also testified that before leaving the house, Hampton knelt down next to Findley's body and whispered in his ear, "I want to let you know I took care of your nigger loving old lady and her little coon baby, too. Don't worry, they didn't feel a thing."

The jury found Petitioner guilty on all counts. It then found that Petitioner was eligible for the death penalty for both counts of murder and concluded that the mitigating circumstances were not sufficiently substantial to call for leniency. The trial court accordingly imposed death sentences for the two murder convictions. It also imposed an

aggravated term of twelve and one-half years for manslaughter, to run consecutively to the death sentences. The Arizona Supreme Court upheld the convictions on direct appeal.

On August 18, 2011, Hampton filed an amended petition for post-conviction relief ("PCR"). He raised six claims:

1. Ineffective assistance of counsel at the guilt phase of trial;

2. Ineffective assistance of counsel at the sentencing phase of trial;

3. Newly-discovered evidence;

4. That the Arizona Supreme Court improperly applied *Tennard v. Dretke*, 542 U.S. 274 (2004);

5. Ineffective assistance of appellate counsel; and

6. The *ex post facto* application of A.R.S. §31-230(C) to the imposed restitution.
(*See* Doc. 51-3 at 158.)

The Court summarily dismissed claims 3 through 6. It concluded that claims 3, 5 and 6 were not colorable, and that claim 4 was procedurally barred under Rule 32.2(a). (*Id.*)

The Court then held a five-day evidentiary hearing on claims 1 and 2. (*See id.* at 176). Petitioner argued that his trial counsel were ineffective at the guilt phase by failing to conduct a reasonable investigation, to call various witnesses and to present evidence in support of a third-party defense. He further argued that they were ineffective at the sentencing phase by failing to conduct a reasonable investigation and failing to call mental health experts to present mitigation evidence. The PCR court denied these claims. (*Id.* at 194.) The Arizona Supreme Court then summarily denied review. (Doc. 54-8 at 138.)

Hampton filed his petition for habeas relief in this Court on October 5, 2015 (Doc. 21), and an amended petition on January 29, 2016 (Doc. 40).

## II.     APPLICABLE LAW

Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The AEDPA defines the substantive and procedural limits on the claims a capital habeas petitioner may bring, and the Rules

Governing Section 2254 Cases define the types of evidentiary development a petitioner may seek if his claims otherwise meet the requirements of the AEDPA.

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Under § 2254(d)(1), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Under § 2254(d)(2), a state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Satisfying § 2254(d)(2) is a "daunting" burden, "one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro* (*Robert Murray*), 745 F.3d 984, 1000 (9th Cir. 2014). A state court's "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor*, 366 F.3d at 1000.

## A. Exhaustion and Procedural Default

The AEDPA requires that a writ of habeas corpus not be granted unless it appears that the petitioner has properly exhausted all available state court remedies. 28 U.S.C. §

2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  To properly exhaust state remedies, the petitioner must "fairly present[]" his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  Petitioners meet this requirement by describing the operative facts and the federal legal theory on which a habeas claim is based so that state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon the claim.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

A claim may also be "technically" exhausted if the petitioner has lost the opportunity to raise his claim on "independent and adequate" state law grounds.  *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.").  Such "technically" exhausted claims, however, are considered procedurally defaulted and are not subject to habeas relief.  *See id.* at 731–32; *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007).

In Arizona, there are two avenues for petitioners to present and exhaust federal constitutional claims in state court:  direct appeal and PCR proceedings.  Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is procedurally barred from relief on any claim that could have been raised on appeal or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  If an Arizona court concludes that a claim was waived under this rule, that independent and adequate procedural ground precludes federal habeas relief.  *See Hurles v. Ryan*, 752 F.3d 768, 780 (9th Cir. 2014).

Procedural default, however, is not an insurmountable bar to relief.  A petitioner may raise a defaulted claim if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Generally, "cause" for a procedural default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Coleman*, 501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a petitioner bears the burden of showing not merely that the errors at his trial were possibly prejudicial, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

Because the acts of a petitioner's counsel are not external to the defense, they are generally attributable to the petitioner, and negligence, ignorance, or inadvertence on counsel's part does not qualify as "cause." *Coleman*, 501 U.S. at 752–54 (citing *Carrier*, 477 U.S. at 488). However, where the ineffective assistance of counsel amounts to an independent constitutional violation, it can establish cause. *Id.* at 753–54; *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998).

For ineffective assistance of counsel claims, a petitioner may establish cause for a procedural default "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14 (2012)); *see also Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015).

To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687–88. The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." *Id.* at 689; *Atwood v. Ryan*, 870 F.3d 1033, 1055 (9th Cir. 2017).

To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel; it has not been expanded to other types of claims. *Pizzuto*, 783 F.3d at 1177 (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63, 2065–66 (2017) (explaining that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

Alternatively, a petitioner may be able to overcome a procedural default by establishing that a fundamental miscarriage of justice occurred. A fundamental miscarriage of justice occurs where the petitioner makes a sufficient showing of actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995) ("[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."). "In *Schlup*, the Court . . . held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup*, 513 U.S.

at 327).  To revive a claim under *Schlup*, a petitioner's claim of innocence must be "truly extraordinary."  *Id.*

### B.    Evidentiary Development

Under the Rules Governing Section 2254 Cases, a petitioner may seek to discover and introduce additional evidence in federal court.  The court's discretion to grant such requests, however, is limited.

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Court emphasized that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 181; *see also Robert Murray*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").  However, *Pinholster* does not bar evidentiary development where the court has determined, based solely on the state court record, that the petitioner "has cleared the § 2254(d) hurdle." *Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1249–50 (11th Cir. 2014); *see Pinholster*, 563 U.S. at 185; *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013).

To clear the § 2254(d) hurdle, a petitioner must establish that the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented" in state court.  28 U.S.C. § 2254(d).  A petitioner who meets the deferential standards of § 2254(d) may be entitled to evidentiary development if the following standards are also met.

First, a habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993).  Rule 6 of the Rules Governing Section 2254 Cases provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  Rule 6(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

Second, a federal court may not hold a hearing unless it first determines that the petitioner did not "fail to develop" the factual basis of the claim in state court. *See Williams v. Taylor* (*Michael Williams*), 529 U.S. 420, 431–32 (2000). "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432; *see also Baja v. Ducharme*, 187 F.3d 1075, 1078–79 (9th Cir. 1999). "[A] petitioner who 'knew of the existence of [] information' at the time of his state court proceedings, but did not present it until federal habeas proceedings, 'failed to develop the factual basis for his claim diligently.'" *Rhoades v. Henry*, 598 F.3d 511, 517 (9th Cir. 2010).

Moreover, an evidentiary hearing is not required if the issues can be resolved by reference to the state court record. *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("It is axiomatic that when issues can be resolved with reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise."); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). Likewise, "an evidentiary hearing is not required if the claim presents a purely legal question and there are no disputed facts." *Beardslee v. Woodford*, 358 F.3d 560, 585 (9th Cir. 2004); *see Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

Finally, under Rule 7 of the Rules Governing Section 2254 Cases, a federal habeas court is authorized to expand the record to include additional material relevant to the petition. The purpose of expansion of the record under Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." Advisory Committee Notes, Rule 7, 28 U.S.C. foll. § 2254; *see also Blackledge v. Allison*, 431 U.S. 63, 81–82 (1977); *Downs v. Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000) (explaining that the need for an evidentiary hearing may be obviated by expansion of record).

**III.     ANALYSIS**

The Petition sets forth 39 claims for relief. For the reasons set forth below, those claims are denied.

## A.      Actual Innocence

In Claim 1, Petitioner alleges that his rights to "due process, a fair trial, a reliable sentence, effective assistance of counsel, and to be free from cruel and unusual punishment" were violated "because he is actually innocent." (Doc. 40 at 26.) He acknowledges, and the Court finds, that this claim was not raised in state court, but Petitioner summarily alleges that he can overcome that procedural default under *Martinez*, *Schlup*, and *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (finding cause and prejudice for the default of a *Brady*[2] claim). The state argues that this claim is not cognizable and without merit. (Doc. 51 at 33.)

The Court need not decide whether the default of this claim can be properly excused because, as this Court has previously explained, *see Hampton v. Ryan*, No. CV-14-2504-PHX-ROS, 2016 WL 3653965, at *4–5 (D. Ariz. July 8, 2016) (denying Petitioner's motion for an order staying and holding in abeyance these habeas proceedings), it is without merit. *See* 28 U.S.C. § 2254(b)(2) (authorizing the denial of meritless habeas claims regardless of the claims' procedural status); *see also Murray v. Schriro* (*Roger Murray*), 882 F.3d 778, 808 (9th Cir. 2018); *Atwood*, 870 F.3d at 1065 n.28. Although the United States Supreme Court has not foreclosed actual innocence claims, *see Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Court has emphasized that the standard for establishing such a claim "would necessarily be extraordinarily high." *Id.* Petitioner has not met that burden. *See Hampton*, 2016 WL 3653965, at *5 ("Hampton has not offered 'new reliable evidence' of his innocence. . . . The evidence does not affirmatively prove that he is more likely than not innocent of the murders and that no reasonable juror would have found him guilty beyond a reasonable doubt." (citation omitted)).

 Petitioner's request for evidentiary development in support of this claim is also denied because Petitioner has not "allege[d] facts which, if proved, would entitle him to

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

relief." *Townsend v. Sain*, 372 U.S. 293, 312–13 (1963), *overruled in part by Keeney v. Tamayo–Reyes*, 504 U.S. 1 (1992); *see also Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005) (a claim must be "colorable" before an evidentiary hearing will be granted). Petitioner alleges that the state's key witness, Misty Ross, later gave conflicting descriptions of the crime, the state's informant, George Ridley, lied on the stand about Petitioner's alleged confession, and that an alternative suspect, Tim Wallace, confessed to the crime. As this Court previously noted, these allegations are insufficient to state a freestanding actual innocence claim. *See Hampton*, 2016 WL 3653965, at *5 ("Hampton has offered no new evidence that would preclude the possibility of his guilt. . . . At most the new evidence undercuts the trial testimony of Misty Ross and George Ridley, . . . but it does so in a way that is cumulative to the impeachment evidence in Hampton's possession at the time of trial." (citations omitted)). Because the facts Petitioner alleges are not sufficient to state an actual innocence claim, evidentiary development would be futile. *See Totten*, 137 F.3d at 1176.

Claim 1 is denied.

Petitioner next asserts that, even if his substantive actual innocence claim fails, his actual innocence excuses the default of other claims based on the "gateway" articulated in *Schlup*. *See* 513 U.S. at 298. Under *Schlup*, an actual innocence claim that is "not itself a constitutional claim" may nonetheless serve as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim[s] considered on the merits." *Id.* at 315 (quoting *Herrera*, 506 U.S. at 404). To revive a claim under *Schlup*, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327.

Petitioner seeks evidentiary development to establish that no reasonable juror would have convicted him in light of new evidence under *Schlup* in order to revive five defaulted claims: Claims 2, 3, 4, 6, and 8. When evaluating a claim under *Schlup*, "a habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern

at trial." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327). To receive a hearing in support of a *Schlup* claim, Petitioner must "make[] a good-faith allegation that would, if true, entitle him to equitable tolling." *Stewart v. Cate*, 757 F.3d 929, 941 (9th Cir. 2014) (quoting *Roy v. Lampert*, 465 F.3d 964, 969 (9th Cir. 2006)).

Even taking the evidence Petitioner offers in support of his actual innocence claim as true, it does not undermine confidence in the outcome of his trial for purposes of *Schlup*. The new evidence Petitioner seeks to admit in support of his actual innocence claim can be summarized as follows: (1) testimony supporting the third-party defense originally presented during Petitioner's trial; (2) testimony that the state's eye witness, Misty Ross, lied and had motive to lie; and (3) testimony that the state's informant, George Ridley, lied and had motive to lie. Much of this evidence was already presented during trial, and any new evidence is not sufficient to undermine confidence in the outcome of Petitioner's trial.

First, Petitioner presented his third-party defense to the jury. One witness, Mark Sandon testified at trial that he heard Tim Wallace confess to the crime. (RT 05/01/02 at 34:5–35:21.) Petitioner now seeks to bolster Wallace's alleged confession by introducing additional witness testimony that Wallace may have committed the crimes and evidence that Wallace may have had motive to commit the crimes. Most notably, Petitioner offers testimony that one of the victims, Charles Findley, may have been cooperating, or willing to cooperate, with police regarding Wallace's drug activities. Petitioner first offers the testimony of Keva Armijo, who asserts that Wallace may have believed that Ridley was "a snitch." (*See* Doc. 73 at 30.) Petitioner acknowledges that Armijo's testimony was available during his trial. (Doc. 40 at 67–70.) The remaining evidence includes statements from Jared Dansby and hearsay statements from Miranda Clark that imply that Wallace may have suspected that Ridley was cooperating with police. (*See* Doc. 73 at 33–34.)

Second, Petitioner seeks to admit evidence that Ross had motive to lie, and did lie, about the murders. Specifically, he offers statements indicating that Ross was angry with Hampton and that she later admitted that she did not actually witness the murders. (*See id.* at 31, 35.) A majority of this evidence is not new—the trial jury heard evidence that Ross

- 12 -

may have had reason to be angry with Hampton. (*See, e.g.*, RT 4/30/02 at 45.) Furthermore, Ross's alleged recantation is unreliable. One witness, who was available during trial, allegedly heard Ross say that Hampton was innocent, but also offers in her declaration that Ross told so many different versions of the crimes that it is unclear "if any of the stories were the truth." (Doc. 42-9 at 2.) The other witnesses Petitioner seeks to present do not suggest that Ross has recanted her testimony. Rather, these witnesses state only that Ross may not have been in the same room as the victims when the murders occurred. (Doc. 43-3 at 15, 18.)

Third, Petitioner's proposed testimony regarding Ridley's capacity for truthfulness and motive to lie is cumulative to the information presented to the jury. As discussed further regarding Claim 2 below, Ridley's testimony was thoroughly impeached on cross examination, and the jury heard that he would do anything to avoid incarceration. Petitioner also offers hearsay testimony that Ridley recanted his trial testimony, but in his own declaration, Ridley does not state that his testimony was untruthful. (Doc. 43-3 at 26.)

Taking this evidence together, it does not undermine confidence in the outcome of Petitioner's trial. Petitioner's actual innocence claim is founded on innuendo and hearsay. While courts must consider all evidence supporting a *Schlup* gateway claim, they must do so with "due regard to any unreliability." *Schlup*, 513 U.S. at 328. Much of the evidence Petitioner seeks to admit is not new or reliable. The remainder is insufficient to undermine confidence in the outcome his trial. The physical evidence corroborates Ross's trial testimony regarding the manner in which the victims were killed: Findley was shot in the head while crouched on the floor, and Ramsdell was shot while lying in bed. Furthermore, Petitioner has not offered compelling evidence to undermine Ross's testimony that it was Hampton who shot the victims. Because Petitioner has not established that he could be entitled to relief based on the evidence he seeks to present, a hearing is unnecessary to deny his *Schlup* gateway claim.

Moreover, even if the Court assumes, *arguendo*, that Petitioner could meet the *Schlup* standard, Petitioner is not entitled to habeas relief because, as explained below, each of the procedurally defaulted claims Petitioner seeks to revive fails on its merits.

### 1.     Claim 2

Petitioner alleges that his rights to "due process, a fair trial, effective assistance of counsel, and freedom from cruel and unusual punishment" were violated by the admission of Ridley's testimony.  (Doc. 40 at 55.)  Specifically, he alleges (A) that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose Ridley's presentence report to the defense; (B) the state violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959) by knowingly permitting Ridley to offer perjured testimony; and (C) Petitioner's trial counsel was ineffective for failing to properly address these issues during the trial.  (*Id.* at 57–65.) Petitioner acknowledges, and the Court finds, that Claim 2 was not presented in state court. Petitioner alleges that he can overcome his procedural default of these claims under the standards in *Schlup* and *Martinez*.  Because Claim 2 is without merit, however, the Court need not determine whether Petitioner can overcome this procedural default.  *See* 28 U.S.C. § 2254(b)(2).

As a preliminary matter, Petitioner has requested evidentiary development—in the form of discovery, a hearing, and expansion of the record—in support of the merits of this claim.  (Doc. 73 at 39–40.)  As this Court previously observed, the new evidence Petitioner seeks to present "[a]t most . . . undercuts the trial testimony of Misty Ross and George Ridley . . . in a way that is cumulative to the impeachment evidence in Hampton's possession at the time of trial."  *Hampton*, 2016 WL 3653965, at *3.  In sum, and as further explained below, Petitioner has not alleged facts that, if proved, would entitle him to relief. *Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) (citing *Insyxiengmay*, 403 F.3d at 670).  Petitioner's request for evidentiary development in support of the merits of Claim 2 is therefore denied.

#### a.     *Brady*

In Claim 2A, Petitioner alleges that the state violated *Brady* by suppressing Ridley's presentence report. There are "three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 281–82). To establish prejudice, a petitioner must show that the suppressed evidence was material to his case—that is, that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Browning v. Baker*, 875 F.3d 444, 464 (9th Cir. 2017) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

This Court previously addressed Petitioner's *Brady* claim and concluded that the information included in Ridley's presentence report was, at best, cumulative to the evidence offered at trial. *Hampton*, 2016 WL 3653965, at *5–7. Because the evidence in Ridley's presentence report was merely cumulative to the evidence already presented to the jury, the state's alleged failure to disclose the report does not undermine confidence in the outcome of Petitioner's trial.

Claim 2A is meritless and is denied.

### b. *Napue*

In Claim 2B, Petitioner alleges that the state violated *Napue* by offering perjured testimony. The Supreme Court has held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. "A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Sivak v. Hardison*, 658 F.3d 898, 908–09 (9th Cir. 2011) (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008)).

Petitioner asserts that he can establish falsity by pointing to Ridley's assertion that he never engaged in violent behavior toward his ex-wife. (Doc. 40 at 63.) The state claims Ridley did not violate *Napue* by answering "no" because "[i]n Ridley's opinion, his actions with his ex-wife were not violent." (Doc. 51 at 51.) The question under *Napue*, however, is not whether the witness knew his testimony to be false, but rather whether the state knew that the testimony was false and thus had a constitutional duty to correct it. *Cf. Hayes v. Brown*, 399 F.3d 972, 980–81 (9th Cir. 2005) (en banc) (rejecting the argument that "it is constitutionally permissible for [the prosecution] knowingly to present false evidence to a jury in order to obtain a conviction, as long as the witness used to transmit the false information is kept unaware of the truth").

Petitioner alleges that Ridley stalked, threatened, and physically abused his former wife, and that counsel for Petitioner and the state were aware of this prior behavior. The defense asked Ridley if any of his prior convictions involved violence or whether he had ever acted violently toward his wife. Ridley answered no to both questions. Ridley's testimony was objectively misleading, if not false, which arguably obligated the state to correct the testimony. *See Towery v. Schriro*, 641 F.3d 300, 309 (9th Cir. 2010) (collecting cases in support of the view "that accurate testimony could be delivered in a sufficiently misleading context to make the evidence false for *Napue* purposes").

Petitioner's *Napue* claim fails, however, because the error was not material. *See Jackson v. Brown*, 513 F.3d 1057, 1075–76 (9th Cir. 2008) ("A jury's finding should be overturned as a result of . . . [a] *Napue* violation[] if and only if [it is] material."). "Instead of asking whether there was a 'reasonable probability' of a different outcome, a *Napue* violation requires a court to ask whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Libberton v. Ryan*, 583 F.3d 1147, 1164 (9th Cir. 2009) (quoting *Hayes*, 399 F.3d at 985).

The state's failure to correct the record in this case was not material. As this Court previously explained, *Hampton*, 2016 WL 3653965, at *6–7, Ridley's credibility was thoroughly impeached during Petitioner's trial. He testified, for example, to his prior

- 16 -

1  stalking conviction, his desire not to return to prison, and his willingness to "say whatever
2  it took" to avoid incarceration. *Id.* In sum, the jury already had notice that Ridley may
3  have been willing to lie, had motive to lie, and had several prior felony convictions. There
4  is no reasonable likelihood that the jury's impression of Ridley and his testimony would
5  have been meaningfully altered by the fact that Ridley gave false or misleading testimony
6  regarding his propensity for violence against his former wife, and thus there is no
7  reasonable probability that the alleged perjury could have affected the jury's judgment.

8  Because Petitioner has failed to allege facts sufficient to establish prejudice for
9  purposes of *Napue*, Claim 2B is denied as meritless.

10                    **c.      Ineffective Assistance of Counsel**

11  Finally, Petitioner alleges in Claim 2C that his counsels' failure to obtain Ridley's
12  presentence report was ineffective assistance. (Doc. 40 at 64–65.) A claim of ineffective
13  assistance of counsel requires that Petitioner establish that counsel's representation fell
14  below an objective standard of reasonableness and that, but for counsel's unprofessional
15  errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

16  Petitioner has failed to establish a reasonable probability that defense counsels'
17  access to or use of Ridley's presentence report would have had any impact on the result of
18  Petitioner's trial. As discussed above and in this Court's prior order, trial counsel
19  thoroughly discredited Ridley during cross examination. There is no reasonable likelihood
20  that having Ridley's presentence report would have made counsels' cross examination
21  more effective, and counsels' failure to obtain the presentence report does not undermine
22  confidence in the outcome of Petitioner's trial.

23  Claim 2C is denied as meritless.

24                    **2.      Claim 3**

25  Petitioner next argues that his counsel were ineffective in preparing and presenting
26  the guilt phase of his trial due to their failure "to call witnesses and present evidence which
27  would have raised reasonable doubt about Mr. Hampton's guilt." (Doc. 40 at 66.)

28

Petitioner requests discovery, expansion of the record, and an evidentiary hearing in support of this claim.  (Doc. 73 at 37–49.)

Petitioner alleges that this claim was raised in state court.  (Doc. 40 at 66.) Respondents state that some unspecified portion of this claim was presented in state court and the remaining portion of this claim is procedurally defaulted.  (Doc. 51 at 52.)  In his PCR petition, Petitioner alleged that his trial counsel was ineffective for failing to call Keva Armijo, "Witness,"[3] Stephanie Janowitz, Jennifer Doer, and Steve Duran, and for failing to present impeachment evidence regarding Sean Geeslin, Tim Wallace, Charles Findley, and Misty Ross.  (Doc. 51-2 at 8–15.)  The PCR court denied this claim (Doc. 54-3 at 183– 84), and the Arizona Supreme Court summarily denied discretionary review (*see id.* at 246–53; Doc. 54-8 at 138).

Before this Court, Petitioner now similarly claims his counsel failed to call Keva Armijo, Witness, Jennifer Doerr, and Stephanie Lopez, but adds that his counsel "were also ineffective in failing to present evidence from Bob Short, Miranda Clark, Edna Mitchell, Jared Dansby, and Steve Duran."  (Doc. 40 at 67–73.)  Petitioner asserts that, to the extent his claim in this Court exceeds the scope of his claim in state court, his failure to raise all parts of his claim is excused by his actual innocence under *Schlup*, the state's suppression of material evidence under *Strickler*, and the ineffectiveness of his post-conviction counsel under *Martinez*.  (*Id.* at 66.)

Petitioner's alteration of this claim does not render it unexhausted.  Factual allegations not presented to a state court may render a claim unexhausted if the allegations "fundamentally alter" the legal claim presented and considered by the state courts.  *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)).  New evidence fundamentally alters a claim if it places the claim in a significantly different and stronger evidentiary posture than it had in state court.  *Id.* (citing *Aiken v. Spalding*, 841 F.2d 881, 883, 884 n.3 (9th Cir. 1988)).  Under *Dickens*, the question of

---

[3] Petitioner identifies "Witness" as a friend of trial witness Misty Ross who has requested anonymity.  (Doc. 40 at 29 n.5.)

whether *Martinez* applies to Claim 3 hinges on whether the claim, as presented in these federal proceedings, is fundamentally different from the one presented in state court.

Claim 3 is not fundamentally different from the ineffective assistance of counsel claim Petitioner raised in state court. A petitioner may "develop additional facts supporting [a] particular" claim of ineffective assistance of counsel, but may not add "unrelated alleged instances of counsel's ineffectiveness." *See Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005); *see also Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013). Petitioner alleged in state court that his counsel was ineffective for failing to sufficiently investigate and present evidence in the guilt phase of the trial, including numerous lay witnesses. Petitioner presents the same claim here but has made some adjustments regarding which specific witnesses he now believes had relevant evidence his counsel should have presented. This change does not render Claim 3 unexhausted.

Because this claim was already fairly presented to the state court, this Court looks to the last reasoned state court decision to determine whether it was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of fact under § 2254(d)(1) and (2). Because the Arizona Supreme Court summarily denied review of this claim, this Court looks to the last merits ruling, which was issued by the state PCR court. *See Robert Murray*, 745 F.3d at 996 ("When a state court does not explain the reason for its decision, we 'look through' to the last state-court decision that provides a reasoned explanation capable of review."). The PCR court concluded that counsel was not ineffective for failing to investigate or failing to introduce the proposed additional evidence. (*See* Doc. 54-3 at 177–84.) The PCR court's decision was not unreasonable for purposes of § 2254(d).

Courts are obligated to presume that trial counsel may have had strategic reasons for failing to call these additional witnesses. *Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial

strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955))). In particular, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

In this case, Petitioner acknowledges that the defense investigator and lead counsel both knew of the witnesses and information Petitioner now alleges should have been presented to the jury. (Doc. 68 at 67.) He argues instead that because his lead counsel, James Logan, did not inform his co-counsel, Maria Schaffer, of this information, his counsels' "investigation" was insufficient. This argument is without merit.

Once Petitioner's lead counsel had access to the information in question, he had discretion to make reasonable tactical decisions regarding how to use it, *see Strickland*, 466 U.S. at 690–91, which would include whether to ask his less experienced co-counsel to evaluate or use that information. Whether the "investigation" was reasonable is a separate question from whether the delegation of tasks amongst the defense team was reasonable after the investigation was complete. The record does not indicate that Petitioner's counsel failed to investigate, and the PCR court was not unreasonable for concluding that counsels' investigation was constitutionally sufficient.

Having concluded that the investigation was sufficient, the PCR court next noted that Petitioner's counsel may have had many reasons, including possible bias, credibility, or consistency problems, for not calling these additional witnesses, and nothing in the record rebuts that presumption. (Doc. 54-3 at 183.) This was not contrary to or an unreasonable application of clearly established federal law. Petitioner's lead counsel knew of the witnesses in question and elected not to call them. Because he did not recall specifics about his strategy in this case, the court did not err by "entertain[ing] the range of possible reasons [Petitioner's] counsel *may* have had for proceeding as [he] did." *Leavitt v. Arave*, 646 F.3d 605, 609 (9th Cir. 2011) (quoting *Pinholster*, 563 U.S. at 195) (internal quotation marks omitted).

Although Schaffer did testify that her failure to pursue these witnesses was not a tactical decision, *see Doe v. Ayers*, 782 F.3d 425, 445 (9th Cir. 2015) ("Generally, we credit

the statements of defense counsel as to whether their decisions at trial were—or were not—based on strategic judgments."), Petitioner himself notes that it was Logan, not Schaffer, who knew of the potential witnesses and elected not to use them during the trial. (*See* Doc. 68 at 67.) Petitioner calls Logan's decision not to use this evidence "puzzling," but, as the PCR court noted, there were objectively reasonable tactical reasons not to pursue the witnesses and evidence. For example, much of the proposed testimony was based on rumors, reputations, and personal relationships rather than direct knowledge or was cumulative to evidence already introduced during trial, such as evidence of drug use, evidence that Ross had motive to lie, and evidence that someone else may have committed the crime. (*See* Doc. 54-3 at 182, 184.)

Habeas relief is unavailable to Petitioner on this claim because the Court cannot say that the state court unreasonably applied clearly established federal law or made an unreasonable determination of the facts when it concluded that Petitioner's trial team reasonably investigated and prepared for the guilt phase of trial. Because Petitioner has failed to meet the § 2254(d) threshold, evidentiary development in support of this claim is also denied. *See Pinholster*, 563 U.S. at 185.

Claim 3 is denied.

### 3.    Claim 4

Petitioner next argues that his rights to "effective assistance of counsel, due process, a fair trial, a reliable sentence, and freedom from cruel and unusual punishment were violated because trial counsel failed to investigate, develop, and present exculpatory evidence" during the penalty phase. (Doc. 40 at 79.) Petitioner argues (A) "[t]rial counsel failed to present substantial mitigating evidence available from other witnesses and experts," and (B) "[t]he Arizona Supreme Court acted unreasonably by failing to grant review of the Superior Court's refusal to find ineffective assistance of counsel during the post-conviction proceedings." (*Id.*)

More specifically, Petitioner alleges that the jury was not adequately presented information related to Petitioner's personal life, including Petitioner's paternal family

history, maternal family, upbringing, and adulthood, including his drug use, alcoholism, past violent behavior, and suicidal ideation. (Doc. 40 at 85–105.) He further argues that his counsel was ineffective for failing to investigate and present expert testimony, including expert testimony regarding (1) the "probable effects" of Petitioner's childhood trauma; (2) fetal alcohol spectrum disorder; (3) hypofrontality and drug addiction; and (4) mental health illnesses. (*Id.* at 106–73.)

Respondents argue that Petitioner raised this ineffective assistance of counsel claim in state court but did not allege related violations of the right to due process, a fair trial, a reliable sentence, or to be free from cruel and unusual punishment. (Doc. 51 at 69.) Petitioner does not deny that he did not raise these additional arguments in state court (Doc. 68 at 89–90), and the Court finds that these claims were procedurally defaulted. Although Petitioner generally asserts that he can overcome any procedural default under *Martinez* and *Schlup* (Doc. 40 at 79), the Petition does not include argument or citation related to "due process, a fair trial, a reliable sentence, and freedom from cruel and unusual punishment" under Claim 4, and therefore this Court does not address these arguments.

Petitioner properly raised this ineffective assistance of counsel claim before the PCR court, which issued the last reasoned state court decision on the issue. (Docs. 51-2 at 15–22, 54-3 at 184–94, 54-8 at 138.) The state PCR court addressed this claim at length. (*See* Doc. 54-3 at 187, 189–90, 192–93.) It first cataloged the extensive mitigation presented with regard to Petitioner's upbringing and family, which was contained in "1000 pages of background materials" and culminated in a "visual depiction of defendant's family constellation and its mental, suicidal, substance abuse and violence-related behaviors." (*Id.* at 187.)

The court next assessed the expert testimony Petitioner alleges his counsel should have presented and the testimony of the state's rebuttal witnesses. (*Id.* at 188–94.) The court concluded that "counsel made a reasonable, tactical choice not to allow defendant to be examined by any State's experts and to avoid introduction of damaging mental health evidence and defendant's statements." (*Id.* at 193.)

- 22 -

1    Petitioner requests evidentiary development, including discovery, expansion of the

2    record, and a hearing, in support of this claim. (Doc. 73 at 42.) But because the PCR

3    court's decision was not contrary to or an unreasonable application of clearly established

4    federal law under § 2254(d)(1), nor was it based on an unreasonable determination of facts

5    under § 2254(d)(2), Petitioner's request for evidentiary development is denied. *See*

6    *Pinholster*, 563 U.S. at 185.

### a.    Unreasonable Determinations of Fact

8    Petitioner alleges, in his reply,[4] that the PCR court violated 28 U.S.C. § 2254(d)(2)

9    by "plainly misapprehend[ing] or misstat[ing] the record" when it denied this claim. (Doc.

10   68 at 94.) He argues, first, that the PCR court ignored parts of testimony offered by

11   Schaffer, who testified that she was tasked with putting together the mitigation presentation

12   but received insufficient guidance on how to do so. (*Id.* at 94–95.) Second, he asserts that

13   the Court gave too much credence to lead counsel Logan's testimony. (*Id.* at 96–98.)

14   Finally, Petitioner alleges that the court did not give enough weight to the expert testimony

15   presented by PCR counsel. (*Id.* at 97–101.)

16   Petitioner does not point to specific errors of fact in the PCR court's decision

17   regarding Logan's testimony or the testimony of the expert witnesses at the PCR hearing.

18   Rather, Petitioner appears to argue that the Court should have weighed this testimony

19   differently, such as by affording more credibility to Schaffer's testimony and less to

20   Logan's testimony. (Doc. 68 at 94–97.) Logan, Petitioner's first-chair attorney, testified

21   that he had limited specific recollection of Petitioner's case (*see, e.g.*, Doc. 51-4 at 11–12,

22   31), but agreed that he would have engaged in a "risk benefit analysis" regarding whether

23   to have a mental health expert testify in the penalty phase (*Id.* at 32–35). Schaffer,

24   Petitioner's second-chair attorney, testified that she "wasn't given much guidance"

---

[4] Petitioner does not specifically articulate an argument under § 2254(d)(2) in his Petition, but rather goes into great detail regarding this argument in his reply, giving Respondents no opportunity to address his specific allegations. Raising an argument for the first time in a reply brief generally subjects that claim to waiver. *Cf., e.g.*, *Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed waived."). Nevertheless, the Court will address this claim.

regarding the penalty phase of trial, but believed, based on her review of relevant case law, that introducing mental health testimony could have opened the door to detrimental mental health evidence. (Doc. 51-4 at 57–61.) Although both attorneys indicated that they might have approached the issue differently in hindsight, neither testified that the decision not to pursue mental health evidence was uninformed or nontactical.

While a federal court "can disagree with a state court's credibility determination," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), there is no basis to do so here. "[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor*, 366 F.3d at 999. This Court cannot say that the PCR court was unreasonable for relying on Logan's testimony. Although Logan admitted to not always having a specific memory of his work on Petitioner's case, he drew on his common practices over many years of trial work to complete any gaps in his specific recollection. The PCR court was not obligated to reject, as Petitioner argues, "virtually all" of Logan's testimony only because he sometimes relied on his general recollection of his practice at the time. Logan's recollection was consistent with the trial court record, including that counsel declined to call a mental health expert based on the trial court's ruling that Petitioner would have to submit to an interview with a state's expert before the defense expert could testify regarding his own interview of Petitioner. (*See* RT 1/17/03 at 17; RT 1/21/03 at 180.)

Furthermore, contrary to Petitioner's argument, the PCR court did not improperly discount parts of Schaffer's testimony. Petitioner emphasizes that Schaffer was relatively inexperienced. Counsel's level of experience, however, is not determinative for purposes of *Strickland*. The question under *Strickland* is not whether counsel was generally experienced—it is whether counsels' specific acts or omissions were reasonable under the circumstances at the time. *See Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."). Schaffer and

Logan both indicated that the decision not to pursue mental health testimony during the penalty phase was tactical. The PCR court, based on defense counsels' testimony and a review the record, reasonably concluded that counsel reasonably sought to avoid the introduction of expert mental health evidence. (Doc. 54-3 at 186–87.)

Similarly, the PCR court detailed the expert testimony presented at the PCR hearing and did not discount the content of that testimony. (Doc. 54-3 at 188–94.) Instead, after considering the testimony at length, the court conducted a *Strickland* analysis by determining whether failing to utilize expert testimony was "reasonable and a matter of trial tactics and strategy." (*Id.* at 192–93.)

Petitioner has not established that the PCR court made an unreasonable determination of fact in violation of § 2254(d)(2).

### b. Unreasonable Applications of Federal Law

Petitioner next alleges that the PCR court's decision "was also contrary to and an unreasonable application of clearly established federal law" under § 2254(d)(1). (Doc. 68 at 101.) The Court disagrees.

Petitioner first faults the PCR court for noting that, due to a change in Arizona's capital sentencing scheme, "the standard of practice in Maricopa County in 2002-2003 for the mitigation phase of capital cases was in a state of flux." (Doc. 54-2 at 186.) This factual observation, the truth of which is not in dispute, is not contrary to federal law. Nothing in the PCR court's decision indicates that it substituted the "standard of practice in Maricopa County in 2002-2003" for the standard of practice for a reasonable attorney at the time of Petitioner's trial when conducting its *Strickland* analysis. The PCR court considered the testimony of a standard of care expert who "based his opinion on the ABA Guidelines" and stated that "[t]he proper standard for attorney performance is that of reasonably effective assistance" before concluding that Petitioner's counsel had acted reasonably. (Doc. 54-3 at 186.) The court's contextual reference to the standard of practice in Maricopa County at the time of Petitioner's trial is not sufficient to show that the court misapplied clearly established federal law.

Petitioner next alleges that counsel did not sufficiently investigate the need for expert testimony in the penalty phase. (Doc. 68 at 105–06.) The PCR court concluded that Petitioner's counsel "conducted an extensive investigation" that resulted in substantial information regarding Petitioner and his family, and that counsels' investigation "was reasonable and does not constitute deficient performance." (Doc. 54-3 at 187.) This was not an unreasonable application of clearly established federal law.

The Supreme Court has held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *See Strickland*, 466 U.S. at 690–91. And when counsel has reason to believe that "pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* at 691. In this case, the PCR court considered the scope of counsels' investigation, which delved extensively into Petitioner's family and personal history and included the advice of a mental health expert. (Doc. 54-3 at 184–94.) Petitioner himself recognizes that his counsel was aware of substantial information, including that Petitioner had suffered head injuries, early childhood trauma, and drug abuse, and that Petitioner had been diagnosed with Anti-Social Personality Disorder ("ASPD") in the past. Furthermore, his counsel hired Dr. Richard Rosengard, a psychiatrist, to analyze Petitioner's mental health. The record indicates that the PCR court was not unreasonable in concluding that counsel conducted a reasonable investigation related to the penalty phase of trial.

Petitioner further argues that "counsel's decision not to call Dr. Rosengard due to a fear of opening the door to the admission of ASPD was not strategic in light of the fact that counsel themselves opened the door to ASPD when they provided the State all of Hampton's past medical records, which contained information regarding the prior diagnosis." (Doc. 68 at 106.) Petitioner's assertion is without merit. The PCR court noted that defense counsel sought to avoid expert testimony on mental health issues. While ASPD was referenced during the penalty phase, those brief references are not equivalent to expert testimony regarding Petitioner's mental health. The PCR court, citing the

testimony of counsel and Dr. Rosengard, noted that counsel carefully weighed whether to call Dr. Rosengard before determining that calling him would pose too grave a risk. The PCR court then concluded that counsels' decision not to call Dr. Rosengard was "tactical" in nature and not unreasonable. This Court cannot say that the PCR court unreasonably applied clearly established federal law.

Petitioner next alleges that the PCR court was unreasonable in concluding that Petitioner's counsel was not deficient for failing to hire additional expert witnesses. (Doc. 68 at 107.) Specifically, he alleges that his counsel should have conducted a reasonable investigation and then presented expert testimony regarding (1) the "probable effects" of Petitioner's childhood trauma; (2) fetal alcohol spectrum disorder; (3) hypofrontality and drug addiction; and (4) mental health illnesses. (*Id.* at 106–61.)

The PCR court noted that the risk of calling other mental health experts was substantially similar to the risk of calling Dr. Rosengard: presenting this evidence "would have opened the door to the introduction of damaging mental health evidence" from the state. (Doc. 54-3 at 192–93.) Counsel knew of Petitioner's prior head injuries, his extensive history of childhood trauma, his suicide attempts, and other information relevant to his mental health history. Counsel conducted a reasonable investigation, and thus had ample discretion to decide which, if any, experts to call on Petitioner's behalf. *See Strickland*, 466 U.S. at 690. The PCR court did not unreasonably apply clearly established federal law when it concluded that counsel was reasonable for attempting to avoid opening the door to expert testimony related to Petitioner's mental health.

Finally, Petitioner faults the PCR court for concluding that he was not prejudiced by any alleged errors. (Doc. 68 at 107.) Under *Strickland*, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The PCR court considered that had Petitioner's counsel introduced mental health testimony at trial, the state would have countered with its own expert testimony, which could have included prior ASPD diagnoses and Petitioner's own statements. It then further considered "the totality of the mitigating

factors . . . compared against the totality of the aggravating factors and the circumstances of this case." (Doc. 54-3 at 194.) The PCR court concluded that there was no probability that, absent any error, the jury would have imposed a life sentence. (Doc. 54-3 at 194.) Petitioner murdered two individuals, one of whom was pregnant. The jury already heard substantial mitigating evidence regarding Petitioner's difficult childhood, family history, and drug use. It is not reasonably likely that the jury would have reached a different conclusion had Petitioner's counsel submitted expert mental health testimony, and thus the PCR court's decision was not an unreasonable application of clearly established federal law.

As Petitioner has not met the § 2254(d) hurdle established in *Pinholster*, he is not entitled to evidentiary development to support this claim, and Claim 4 is denied.

### 4.      Claim 6

Petitioner alleges (A) prosecutorial misconduct in violation of his due process rights, and (B) ineffective assistance of counsel based on counsel's failure to challenge the alleged misconduct. (Doc. 40 at 180.) The parties agree that these claims were not raised in state court, and the Court finds that they were procedurally defaulted. Petitioner alleges that he can overcome his default of these claims under *Martinez* and *Schlup*, but because these claims are plainly without merit, the Court need not address these arguments. *See* 28 U.S.C. § 2254(b)(2).

### a.      Prosecutorial Misconduct

A habeas petition alleging prosecutorial misconduct will be granted only when the misconduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A trial error is presumed to be harmless unless the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The alleged misconduct includes numerous aspects of the state's penalty-phase closing argument. Petitioner notes, for example, that the prosecutor characterized

1 Petitioner as "the harbinger of death" and "a monster" and used the phrase "urban
2 terrorism," which Petitioner argues was highly inflammatory. Petitioner further argues that
3 the prosecutor improperly allied the jury with law enforcement and misstated the law
4 regarding mitigation.

5 The alleged errors occurred during closing arguments. Closing arguments are not
6 evidence and are presumed to carry less weight with the jury than the court's instructions.
7 *Boyde v. California*, 494 U.S. 370, 384 (1990); *Houston v. Roe*, 177 F.3d 901, 909 (9th
8 Cir. 1999). Prosecutorial argument generally should not result in reversal where the trial
9 court instructed the jury that its decision is to be based solely upon the evidence, where the
10 defense did not object, where the comments were an "invited response," or where there is
11 overwhelming evidence of guilt. *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 182
12 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 640–45 (1974); *Jeffries v. Blodgett*, 5
13 F.3d 1180, 1191–92 (9th Cir. 1993); *Hall v. Whitley*, 935 F.2d 164, 165–66 (9th Cir. 1991).

14 In this case, the jury received the following instruction: "In their opening statements
15 and closing arguments the lawyer[s] have talked to [you] about the law and evidence. *What*
16 *they said is not evidence.* However, it may have help [sic] you to understand the law and
17 the evidence as it was presented. *You must disregard any remark, statement or argument*
18 *that is not supported by the evidence or the law, as given to you by the Court.*" (RT 1/23/03
19 at 108 (emphasis added).)

20 The prosecutor's characterizations of both Petitioner and the concept of mitigation
21 were condemnable. *See Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir. 2007) (condemning
22 prosecutor's decision to characterize a defendant "a 'monster' and 'filth,' . . . [and] a
23 'reincarnation of the devil.'"); *see also United States v. Berry*, 627 F.2d 193, 200 (9th Cir.
24 1980) ("A prosecutor should not misstate the law in closing argument."). And the
25 prosecutor's decision to attempt to paint the jury as on the same "side" as law enforcement
26 was also undesirable, at best. *See Leavitt v. Arave*, 383 F.3d 809, 834–35 (9th Cir. 2004)
27 (excoriating a prosecutor's "link-in-the-chain-of-law-enforcement argument"). But this
28 Court cannot say that the prosecutor's words in closing argument, particularly when paired

with the trial court's instructions, resulted in a trial that "was so infected with unfairness as to be a denial of due process." *See id.* ("[W]e are unable to say that the error had a 'substantial and injurious' effect on the verdict."). The jury was instructed that counsel's arguments were not evidence and to follow the statements of the law they had been given in writing.

Petitioner has failed to establish prejudice. Claim 6A is denied on its merits.

### b. Ineffective Assistance of Counsel

Petitioner's ineffective assistance of counsel claim is similarly without merit. The decision whether and when to object during closing argument is generally a strategic one. *See United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."). Even if counsel had objected, there is no reasonable likelihood that such an objection would have affected the outcome. *See Strickland*, 466 U.S. at 694. As mentioned above, the jury was properly instructed that arguments are not evidence, and that the statements of the law provided by the court were controlling. Any objection would likely have been futile. Petitioner has failed to establish prejudice under *Strickland*.

Claim 6B is denied on its merits.

### 5. Claim 8

Petitioner alleges that his rights to "due process, equal protection, a jury trial, effective assistance of counsel, and a reliable sentence [were violated] due to the presence on Mr. Hampton's penalty jury of an individual who could not be impartial and should have been challenged for cause." (Doc. 40 at 195.) He further alleges that counsel should have elected to strike the juror in question, Rodney Rego, from the jury. The parties agree that this claim was not raised in state court, and the Court finds that it is procedurally defaulted. Petitioner alleges, however, that he can overcome this default under *Martinez*

and *Schlup*.  Because this claim is plainly without merit, the Court will not address these arguments.  *See* 28 U.S.C. § 2254(b)(2).

Petitioner alleges that juror Rego should have been challenged for cause due to the "implied bias" resulting from his former employment as a police officer and work as a probation officer.  Even assuming it could be deemed "unreasonable" for an attorney not to infer bias based solely on a prospective juror's occupation, had counsel inferred such a bias and challenged the juror for cause, Rego's formal affiliations with law enforcement do not per se disqualify him from jury service.  *See, e.g.*, *United States v. Daly*, 716 F.2d 1499, 1507 (9th Cir. 1983) ("The mere fact that a person was employed on a police force is not per se a disqualification for service on a jury in a criminal trial."); *United States v. Le Pera*, 443 F.2d 810, 812 (9th Cir. 1971) ("Bias and prejudice will not be presumed from the fact that a juror is engaged in law enforcement work."); *see also Porter v. Zook*, 898 F.3d 408, 445 (4th Cir. 2018) ("Pernell Treakle's occupation as a deputy sheriff would not provide a basis for finding implied bias.").

Furthermore, Petitioner does not allege, and nothing in the record indicates, that counsel had reason to believe that Rego was actually biased during voir dire.  *See Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) ("Actual bias is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view.").  It was therefore not unreasonable for Petitioner's counsel to refrain from striking Rego from the jury.

Finally, Petitioner also requests evidentiary development in support of this claim. (Doc. 73 at 56.)  Evidentiary development is not necessary where the face of the record precludes relief.  *Totten*, 137 F.3d at 1176.  Petitioner's request for evidentiary development is denied.  Claim 8 is denied on its merits.

## B.    Remaining Ineffective Assistance of Counsel Claims

Petitioner alleges two additional claims of ineffective assistance of counsel:  Claims 10 and 11.

### 1. Claim 10

Petitioner alleges that his trial counsel "failed to object to the restraints placed on Mr. Hampton and appellate counsel failed to raise the issue on appeal." (Doc. 40 at 205.) The parties agree that this claim was not raised in state court (Docs. 40 at 205, 51 at 135), and the Court finds that it is procedurally defaulted. Petitioner asserts that he can overcome this default under *Martinez*.

Because Claim 10 is not "substantial" for purposes of *Martinez*, it remains procedurally defaulted. *See Cook*, 688 F.3d at 607, 610. "Before a court may order the use of physical restraints on a defendant at trial, 'the court must be persuaded by compelling circumstances that some measure is needed to maintain security of the courtroom,' and 'the court must pursue less restrictive alternatives before imposing physical restraints.'" *Gonzalez v. Pliler*, 341 F.3d 897, 901 (9th Cir. 2003) (quoting *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995)). "To demonstrate that his shackling at trial amounted to a constitutional violation, Petitioner must demonstrate: (1) that he was 'physically restrained in the presence of the jury,' (2) that 'the shackling was seen by the jury,' (3) that the 'physical restraint was not justified by state interests,' and (4) that 'he suffered prejudice as a result.'" *Cox v. Ayers*, 613 F.3d 883, 890 (9th Cir. 2010). To establish prejudice, Petitioner must show the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.

Petitioner acknowledges that it is unclear whether the stun belt Petitioner wore was visible to the jurors and does not point to any indication that the jury noticed or was affected by the stun belt. Petitioner alleges, rather, that it is "premature" for him to be required to make these showings. (Doc. 68 at 176.) Petitioner has not, however, requested evidentiary development related to this claim, and the existing record is insufficient to support Petitioner's speculation that his trial may have been affected by his counsel's failure to object to the stun belt.

Because this claim lacks merit, Petitioner cannot establish cause or prejudice under *Martinez*. Claim 10 remains defaulted and is denied.

## 2.    Claim 11

Petitioner alleges that his "constitutional rights to effective assistance of counsel, due process, a fair trial, a reliable sentence, and freedom from cruel and unusual punishment were violated because trial counsel failed to investigate, develop, and present exculpatory evidence." (Doc. 40 at 211.)

This claim, which significantly overlaps Claim 3, appears to be derived from a similar claim Petitioner raised in state court. Before the PCR court, Petitioner argued, based on Arizona Rule of Criminal Procedure 32.1(e), that "the testimony of 'Witness' and the recanted testimony of Monica [Majors] are newly discovered evidence" that, had they been discovered prior to trial, would have changed the outcome. (Doc. 51-3 at 159–60.) The PCR court rejected these arguments. It concluded that Witness "was known to . . . counsel before trial" and therefore her proposed testimony was not newly discovered evidence for purposes of Rule 32.1(e). It then found that although Majors' testimony was newly discovered evidence, it would not have "substantially undermine[d] critically significant testimony" for purposes of Rule 32.1(e)(3). (*Id.*) In his petition for review to the Arizona Supreme Court, Petitioner alleged that the PCR court's denial of a hearing on this claim was "error." (Doc. 54-3 at 264–65.) Petitioner did not allege the ineffective assistance of his counsel or cite any federal law in support of this argument. (*Id.*)

To the extent Petitioner now alleges that his counsel was ineffective for failing to call Witness during the guilt phase of his trial, this argument is included as part of Claim 3, addressed above. The remainder of Claim 11 was not properly presented in state court and is therefore procedurally defaulted. Petitioner alleges that he can overcome any procedural default under *Martinez*. The Court disagrees.

First, *Martinez* can only revive defaulted claims of ineffective assistance of counsel. *Pizzuto*, 783 F.3d at 1176–77. It therefore cannot be used to excuse the default of Petitioner's new, generalized claims that his rights to "due process, a fair trial, a reliable sentence, and freedom from cruel and unusual punishment" were violated. Second, to revive a defaulted claim of ineffective assistance of counsel under *Martinez*, a petitioner

must show that the underlying constitutional violation is "substantial." *See Cook*, 688 F.3d at 607, 610. Petitioner does not adequately explain how his trial counsel was ineffective for generally "fail[ing] to learn that" Majors "did not hear Hampton confess." (Doc. 68 at 177.) Majors allegedly recanted her testimony that Hampton confessed to the crimes after the trial. Petitioner's trial counsel was not ineffective for failing to discover that Majors had recanted before she had done so.

Petitioner cannot establish cause or prejudice under *Martinez*. Claim 11 thus remains procedurally defaulted and is denied.

## C. Remaining Defaulted Claims

Petitioner raises seven additional claims that he did not previously present in state court: Claims 5, 7, 9, 12, 29, 37, and 39.

### 1. Claim 5

Petitioner asserts that "[t]he presentation of evidence during both the guilt and penalty phases of his trial that Mr. Hampton was affiliated with the Aryan Brotherhood violated Mr. Hampton's constitutional right to free association, free speech, due process, a fair trial, a reliable sentence, effective assistance of counsel, and freedom from cruel and unusual punishment." (Doc. 40 at 174.) Petitioner asserts that this claim was not raised in state court, but that he can overcome its default under *Martinez*. (*Id.*) The state responds that Petitioner raised "a portion of this claim" in state court. (Doc. 51 at 101.) The Court agrees with Petitioner that this claim is procedurally defaulted.

In state court, Petitioner did not challenge the introduction of Aryan Brotherhood evidence during the guilt phase of his trial, but Petitioner did allege that his counsel on direct appeal was ineffective for failing to challenge the introduction of Aryan Brotherhood evidence during the penalty phase of his trial. (Doc. 51-2 at 24.) Petitioner raised this claim in his PCR petition, and the PCR court rejected this claim, reasoning that Petitioner's counsel was not ineffective, and Petitioner was not prejudiced by any error. (Doc. 51-3 at 160–61.) Petitioner did not, however, raise this issue in his petition for review before the Arizona Supreme Court. (*See* Docs. 54-3 at 219; 40 at 174 n.24.)

Because Petitioner failed to raise this claim in his petition for review, the Court finds that this claim is procedurally defaulted. *See Davis v. Silva*, 511 F.3d 1005, 1008 (9th Cir. 2008) ("Exhaustion requires that a petitioner 'fairly present[]' his federal claims *to the highest state court available*." (emphasis added)). Furthermore, *Martinez* cannot excuse this default. *Martinez* applies only to ineffective assistance of trial counsel claims that were not raised at their first opportunity due to ineffective assistance of post-conviction counsel. *Davila*, 137 S. Ct. at 2065–66. It does not extend to the ineffective assistance of appellate counsel claim that Petitioner raised during PCR proceedings but failed to raise before the Arizona Supreme Court.

Claim 5 is denied.

**2.  Claims 7, 9, 12, 29, 37, and 39**

Although Petitioner acknowledges that Claims 7, 9, 12, 29, 37, and 39 are procedurally defaulted, he argues that he can establish cause and prejudice to excuse their default under *Martinez*. The Court disagrees.

*Martinez* applies only to defaulted claims of ineffective assistance of trial counsel. *See Davila*, 137 S. Ct. at 2065–66 (noting that *Martinez* "applies only to claims of 'ineffective assistance of counsel at trial' and only when, 'under state law,' those claims 'must be raised in an initial-review collateral proceeding'"); *Pizzuto*, 783 F.3d at 1176–77. Unlike allegations of ineffective assistance of trial counsel, claims that could have been raised on direct appeal are not subject to the "limited qualification to *Coleman*" established in *Martinez*, 566 U.S. at 15.

The following claims, which do not allege ineffective assistance of counsel, could have been presented to Arizona Supreme Court:

- In Claim 7, Petitioner asserts that he "was deprived of his right to due process of law and a reliable sentence . . . because his capital trial and subsequent proceedings were conducted by, and his conviction and sentences were reviewed by, judicial officers subject to retention elections for retaining their offices and who therefore could not be impartial in his case." (Doc. 40 at 188.)

- In Claim 9, Petitioner alleges that "his right to a fair and impartial jury was violated when the trial court refused to excuse four penalty phase jurors who had seen a newspaper article about his case." (Doc. 40 at 259.)

- In Claim 12, Petitioner alleges that he was "was deprived of his rights to a fair and impartial jury, a fair sentencing proceeding, due process, effective assistance of counsel,[5] freedom from cruel and unusual punishment, and a reliable sentence" based on *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) because (1) he suffered from mental health issues; (2) the jury heard evidence that Petitioner was associated with the Aryan Brotherhood; and (3) the jury heard evidence from a "government informant." (Doc. 40 at 213–18.)

- In Claim 29, Petitioner argues that the trial court sent the jury a "coercive instruction" in response to a question, which violated his "Sixth and Fourteenth Amendment rights to a fair trial and due process." (Doc. 40 at 298.)

- In Claim 37, Petitioner asserts that "Arizona's requirement that mitigating factors be proved by a preponderance of the evidence unconstitutionally prevents the jury from considering mitigating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution." (Doc. 40 at 315.)

- Finally, in Claim 39, Petitioner alleges cumulative error. (Doc. 40 at 319.)

Petitioner did not raise these claims in state court, nor did he raise his appellate counsel's failure to assert these claims as independent ineffective assistance of counsel claims. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted . . . ."); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988). Because these claims remain procedurally defaulted, they are not subject to AEDPA review

---

[5] Petitioner does not support his cursory reference to ineffective assistance of counsel in Claim 12 with argument or citation to authority. Rather, at most, he reasserts the ineffective assistance of his counsel "in developing and presenting impeachment evidence" as articulated in other claims. (Doc. 40 at 217.) The Court therefore does not address this subclaim.

and are denied. Accordingly, Petitioner's requests for evidentiary development in support of Claims 12 and 27 are also denied.

**D.      Petitioner's Remaining Claims**

Claims 5, 13 through 28, and 30 through 36 were previously adjudicated, in whole or in part, on the merits by Arizona state courts. As set forth below, the the state courts' adjudication of these claims was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts under § 2254(d).

**1.      Claim 13**

Petitioner was convicted on May 2, 2002, and was originally scheduled for sentencing before the trial judge. On June 24, 2002, prior to Petitioner's sentencing, the United States Supreme Court invalidated Arizona's death penalty scheme under which judges rather than juries found the facts making a defendant eligible for the death penalty. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). On August 1, 2002, Arizona amended its death penalty statutes to comply with *Ring*. In light of these changes, the trial court empaneled a new jury to make Petitioner's sentencing decision. The aggravation phase of Petitioner's trial began on January 8, 2003. The second jury sentenced Petitioner to death.

Petitioner alleges that applying the state's amended death penalty statutes to his case violated the ex post facto doctrine. (Doc. 40 at 220.) Petitioner raised this claim on direct appeal. In denying the claim, the Arizona Supreme Court cited its opinion in *State v. Ring*, 204 Ariz. 534, 547 ¶¶ 23–24, 65 P.3d 915, 928 (2003), in which the court held that the Ex Post Facto Clause did not prohibit the resentencing of capital defendants after *Ring v. Arizona* because the amendments were procedural in nature and did not place defendants in jeopardy of a greater punishment. *See Hampton*, 213 Ariz. at 174 ¶ 24, 140 P.3d at 957.

The ex post facto doctrine prohibits a state from "retroactively alter[ing] the definition of crimes or increas[ing] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the

punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." *Dobbert v. Florida*, 432 U.S. 282, 292 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925)).

A law that is merely procedural, however, does not violate the ex post facto doctrine. *Id.* at 293, 297 (rejecting a claim that an amendment to Florida's death penalty scheme was an ex post facto violation because the changes in Florida's statute were "clearly procedural"). Procedural changes "simply alter[] the methods employed in determining whether the death penalty [may] be imposed" but do not affect "the quantum of punishment attached to the crime." *Id.* at 293–94.

The post-*Ring* procedural changes in Arizona's death penalty are not ex post facto laws. *See Schriro v. Summerlin*, 542 U.S. 348, 353–54 (2004) ("*Ring*'s holding is properly classified as procedural."). Petitioner distinguishes *Summerlin* by arguing that it "addressed whether the *Ring* decision was procedural rather than substantive; it did not address whether Arizona's new death penalty statute was procedural or substantive." (Doc. 40 at 221.) He argues that the legislature responded to *Ring* by enacting a "more onerous" statute. (*Id.*) Petitioner ignores, however, that the maximum punishment for his crimes— the first-degree murder of two people—did not change when the death penalty statute was enacted. *See Ring*, 204 Ariz. at 544 ¶ 7, 65 P.3d at 925 (noting that first degree murder has been punishable by death in Arizona since as early as 1913).

The statute in place at the time Petitioner committed the murders and the statute enacted after *Ring* provided for the same quantum of punishment. While *Ring* invalidated the procedure by which the death penalty was imposed in Arizona, it did not eliminate the death penalty as a possible sentence for first-degree murder. Accordingly, the Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Claim 13 is denied.

### 2. Claim 14

Petitioner argues that the state violated his "constitutional right to due process, a fair trial, effective assistance of counsel, and freedom from cruel and unusual punishment" by failing to "provide a notice of aggravating circumstances or submit the aggravating circumstances for a probable cause hearing." (Doc. 40 at 226.) Petitioner raised all but one of these allegations on direct appeal. [6]

The Arizona Supreme Court summarily dismissed Petitioner's due process and related state statutory claim and did not address Petitioner's "fair trial" or "effective assistance of counsel" arguments. The court concluded that "Hampton received notice of the aggravating circumstances eight months before the aggravation phase of his trial and does not claim any prejudice from the fact that the notice came after conviction." *Hampton*, 213 Ariz. at 175 ¶ 28, 140 P.3d at 958. This decision is not contrary to, or an unreasonable application of, clearly established federal law.

In *Ring*, 536 U.S. at 609, the Supreme Court found that Arizona's aggravating factors are an element of the offense of capital murder. As Petitioner notes, the Court has held that facts constituting the elements of an offense must be charged in a federal indictment. *See Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."). The Court has not, however, addressed whether this requirement extends to the states. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 n.3 (2000) (declining to address "the indictment question"). The Arizona Supreme Court's decision is thus not an unreasonable application of "clearly established" federal law under § 2254(d)(1). *See Wright*, 552 U.S. at 126.

---

[6] Petitioner did not specifically allege in state court that the state's failure to provide him notice of the aggravating circumstances denied him freedom from cruel and unusual punishment, nor does he support this specific allegation in his Petition before this Court. Petitioner makes similarly cursory references to various constitutional provisions in Claims 15 and 19 through 24. The Court does not address defaulted sub-claims that Petitioner has not adequately supported with argument or citation.

Petitioner offers several related arguments, including that Arizona entitles him to an evidentiary hearing under Arizona Rule of Criminal Procedure 5.4(a), and that the state's failure to afford him this hearing deprived him of his "state-created, constitutionally protected liberty interest in the fair administration of state procedures governing the aggravating circumstances in his case." (Doc. 40 at 227.) Even assuming that this argument is sufficiently related to the arguments Petitioner fairly presented to the state court to avoid procedural default, Petitioner does not allege that he was deprived a probable cause hearing regarding whether "an offense ha[d] been committed and that the defendant committed it." Ariz. R. Crim. P. 5.4(a). Petitioner has not shown that Arizona has established a right, redressable under the federal constitution, to a probable cause hearing regarding individual aggravating factors.

Finally, Petitioner alleges that his counsel was inherently ineffective due to their inability to know which aggravating factors the state would eventually charge. This claim is purely speculative, and Petitioner cannot show that he was prejudiced for purposes of *Strickland*. This claim is thus without merit.

Claim 14 is denied.

### 3. Claim 15

Petitioner argues that his rights "to due process, a fair trial, effective assistance of counsel, freedom from cruel and unusual punishment, and an impartial jury" were violated "[b]y having a different jury sit for [his] penalty-phase than during his guilt-phase." (Doc. 40 at 233.) Primarily, Petitioner asserts that the sentencing jury "was deprived of evidence from the guilt trial." (*Id.* at 234.)

Petitioner raised this claim, in pertinent part, before the Arizona Supreme Court, which concluded that Petitioner had not identified "any evidence from the guilt phase that would have been helpful to the aggravation/penalty jury, nor does he claim he was prevented from presenting any such evidence to that jury." *Hampton*, 213 Ariz. at 175 ¶ 30, 140 P.3d at 958. The court's decision was not contrary to or an unreasonable application of clearly established federal law.

Petitioner is correct that a defendant is entitled to have a factfinder "take[] into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial." *See Stringer v. Black*, 503 U.S. 222, 230 (1992) (quoting *Zant v. Stephens*, 462 U.S. 862, 872 (1983)). The jury did so here. In addition to readmitting all the same exhibits that were introduced during the guilt phase (RT 1/07/03 at 35–38), the parties introduced, examined, and cross examined nearly all the same witnesses in the penalty phase. The record indicates that the trial court intended to ensure that the second jury would have substantially the same picture of the case as the guilt-phase jury. (RT 01/06/03 at 53:6–24.) The similarity between the transcripts of both presentations indicates that the court succeeded. Petitioner's counsel had ample opportunity to show the second jury any information relevant to Petitioner's sentence, and he cannot establish that his rights were violated by this procedure. *Cf. Morgan v. Illinois*, 504 U.S. 719, 725–26 (1992) (noting that there is not one right way for a state to set up its capital sentencing scheme).

Furthermore, any error was not structural. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (trial errors "'occur[] during presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt'" (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991))). Just as the Arizona Supreme Court noted, Petitioner does not identify any specific evidence introduced during the guilt phase of his trial, but not reintroduced during the penalty phase of his trial, that he believes would have benefited him. He thus was not prejudiced by any alleged error. The Arizona Supreme Court was not unreasonable in denying this claim.

Claim 15 is denied.

### 4.      Claim 16

Petitioner argues that his sentencing proceeding (1) "was an impermissible attempt to increase the sentences applicable" to him, and (2) "supplemented the original jury verdict" in violation of the Double Jeopardy Clause. (Doc. 40 at 241–47.) Petitioner raised this claim on direct appeal, and the Arizona Supreme Court concluded that empaneling a

second jury did not violate the Double Jeopardy Clause. *Hampton*, 213 Ariz. at 175–76 ¶ 33, 140 P.3d at 958–59 (citing *Ring*, 204 Ariz. at 548–49 ¶¶ 29–32, 65 P.3d at 929–30 and *State v. Anderson*, 210 Ariz. 327, 348 ¶ 87, 111 P.3d 369, 390 (2005)). This conclusion is not contrary to or an unreasonable application of clearly established federal law.

The Double Jeopardy Clause of the Fifth Amendment protects against "a second prosecution for the same offense" after conviction and against multiple punishments for the same offense. *Schiro v. Farley*, 510 U.S. 222, 229–30 (1994). The Supreme Court has held that the sentencing phase of a capital case is not a successive prosecution for double jeopardy purposes. *See id.* at 230–32 ("The state is entitled to 'one fair opportunity' to prosecute a defendant . . ., and that opportunity extends not only to prosecution at the guilt phase, but also to present evidence at an ensuing sentencing proceeding." (citation omitted)). "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice's between the alternative verdicts of death and life imprisonment." *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)). No clearly established federal law holds that empaneling a second jury for sentencing implicates the Double Jeopardy Clause. The second jury's decision to sentence Petitioner to death based on his conviction did not increase the applicable sentence nor did it supplement the verdict.

In support of this claim, Petitioner echoes the arguments he makes under Claim 13, in which he argues that the ex post facto doctrine barred his death sentence due to the timing of the Supreme Court's *Ring* decision. As noted above, *Ring* did not change the consequences the state established for Petitioner's crimes, and a fortuitous timing of the lapse between the *Ring* decision and the Arizona legislature's amendment to the death penalty statutes did not entitle Petitioner to an automatic life sentence. *Cf. Dobbert*, 432 U.S. at 297 (denying a petitioner's "highly technical" and "sophistic" claim that "there was no 'valid' death penalty in effect in Florida as of the date of his actions" due to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972)).

Claim 16 is denied.

5.      **Claim 17**

Petitioner argues that jurors were arbitrarily removed from his jury during the "death qualification" process.  (Doc. 40 at 248.)  The Arizona Supreme Court concluded that "[t]he United States Supreme Court has long held that the death qualification of juries is constitutional."  *Hampton*, 213 Ariz. at 172–73 ¶ 14, 140 P.3d at 955–56 (citing *Wainwright v. Witt*, 469 U.S. 412, 424–25 (1985)).

The Arizona Supreme Court's conclusion is not an unreasonable application of or contrary to clearly established federal law.  *See Lockhart v. McCree*, 476 U.S. 162, 175–76 (1986) ("'Death qualification,' . . . is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial.").  Removing jurors who do not believe they can follow the law is not arbitrary, and thus removing jurors who do not believe they can follow the law regarding the death penalty due to their moral or personal beliefs is not arbitrary.  *See id.* at 176.

Because Petitioner has failed to meet the § 2254(d) threshold, he is not entitled to the evidentiary development he has requested in support of this claim.  Claim 17 is denied.

6.      **Claim 18**

Petitioner asserts that "[a]pplying the fetal manslaughter statute to the facts of this case violates Mr. Hampton's right to due process, a fair trial, effective assistance of counsel, freedom from cruel and unusual punishment, and the Ex Post Facto Clause." (Doc. 40 at 256.)  In his reply, Petitioner further argues the Arizona Supreme Court's interpretation of the state statute governing fetal manslaughter violated the rule of lenity, "rendering the statute void for vagueness," and failed to provide adequate notice.  (Doc. 68 at 190–93.)

Respondents argue that this issue was not raised in state court despite Petitioner's citations to the federal constitution in his opening brief on direct appeal to the Arizona Supreme Court.  (Doc. 51 at 166.)  Petitioner's opening brief states that the trial court's interpretation of Arizona's fetal manslaughter statute, A.R.S. § 13-1103, violated his "right

to a fair trial and due process" and cites to the federal constitution. (Doc. 51-1 at 87–88.) To the extent Petitioner now seeks to raise broader claims related to the Ex Post Facto Clause, cruel and unusual punishment, and ineffective assistance of counsel, those claims were not presented in state court, and Petitioner does not allege he can overcome their procedural default.

Assuming, *arguendo*, that Petitioner's remaining due process claim was fairly presented in state court, it is without merit. *See* 28 U.S.C. § 2254(b)(2). At the time of the crimes, Arizona's fetal manslaughter statute read: "A person commits manslaughter by . . . [k]nowingly or recklessly causing the death of an unborn child at any stage of its development by any physical injury to the mother of such child which would be murder if the death of the mother had occurred." A.R.S. § 13-1103(A)(5) (1993). Petitioner argued that this statute was not intended to apply when the mother and fetus were both killed. The Arizona Supreme Court concluded that the statute, though "not worded felicitously," was "plainly intended to protect the life of the fetus" regardless of whether the mother also died. *Hampton*, 213 Ariz. at 174 ¶ 23, 140 P.3d at 957 ("It would . . . be illogical to interpret the statute as treating a murderer who successfully kills both mother and unborn child more favorably than a murderer who manages to kill only the unborn child.").

State law error is generally not reviewable in habeas proceedings but may implicate federal due process protections if the error is so prejudicial that it renders the defendant's trial fundamentally unfair. *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *see also Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) ("A writ of habeas corpus . . . is unavailable for alleged error in the interpretation or application of state law."). This Court cannot say that the state court's interpretation of Arizona law was so arbitrary or irrational that it violated Petitioner's right to due process.

Claim 18 is denied.

### 7. Claim 19

Petitioner argues that "[c]onditioning the admissibility of Mr. Hampton's expert testimony on Mr. Hampton speaking to the state's expert violated his right to due process,

freedom from self-incrimination, fair trial, effective assistance of counsel, and freedom from cruel and unusual punishment." (Doc. 40 at 259.) Petitioner raised a majority of this argument on direct appeal.

At trial, Petitioner's counsel retained Dr. Rosengard as a mental health expert. Dr. Rosengard interviewed Petitioner. The state then filed a motion to preclude Dr. Rosengard's testimony, arguing that Petitioner could not present mental health testimony unless the state's expert, Dr. Bayless, could also interview Petitioner. Petitioner responded that he had Fifth and Sixth Amendment rights not to submit to the state's proposed interview. The trial court concluded that if Petitioner asserted his Fifth Amendment right against self-incrimination, he would then be limited to presenting expert testimony "without reference to the interview or any opinion based on the interview" unless the state's expert could also perform an interview. (RT 1/13/03 at 108.) Petitioner elected to forgo an interview with Dr. Bayless (RT 1/17/03 at 17), and ultimately elected not to call Dr. Rosengard (RT 1/21/03 at 180).

On direct appeal, the Arizona Supreme Court concluded that a trial court may "preclude a capital defendant from presenting mental health expert testimony as mitigation evidence if the defendant refuses to submit to an examination by the State's mental health expert." *Hampton*, 213 Ariz. at 178 ¶ 44, 140 P.3d at 961. This conclusion was not contrary to or an unreasonable application of clearly established federal law.

"[A] defendant who asserts a mental status defense lacks a Fifth Amendment right to remain silent regarding the mental status that he has placed at issue." *Pawlyk v. Wood*, 248 F.3d 815, 825 (9th Cir. 2001) (citing *Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987); *Estelle v. Smith*, 451 U.S. 454, 465 (1981)). Petitioner's right to avoid self-incrimination was therefore not implicated.

To establish a due process violation, Petitioner would need to show that his trial was fundamentally unfair. *See Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). The trial court did not prevent Petitioner from introducing mental health testimony. Rather, it put Petitioner on notice that it would allow the state to rebut any such evidence. *See Buchanan*,

483 U.S. at 422–23 ("[I]f a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested."). Petitioner did not receive a fundamentally unfair trial.

Because the state court's decision was not contrary to or an unreasonable application of federal law, Claim 19 is denied.

### 8.    Claim 20

Petitioner asserts that the admission of "prior bad acts" during the penalty phase of his trial violated his rights to "due process, a fair trial, effective assistance of counsel, and freedom from cruel and unusual punishment." (Doc. 40 at 264.) Petitioner raised a majority of this claim on direct appeal.

During the penalty phase of trial, Petitioner offered mitigation evidence that included, *inter alia*, his difficult upbringing, love of family, and penchant for protecting others. (*See* RT 1/21/03 at 11–27.) In rebuttal, the state called Petitioner's former girlfriend, Monica Majors, who testified that Petitioner had engaged in violent and threatening behavior. (RT 1/23/03 at 19–28.) On direct appeal, the Arizona Supreme Court concluded that the trial court did not abuse its discretion by allowing the testimony: "Majors' testimony regarding Hampton's abusive treatment of her and his brother directly rebutted this mitigation evidence and was therefore relevant to the issue of mitigation." *Hampton*, 213 Ariz. at 179 ¶ 47, 140 P.3d at 962. The state court's ruling does not implicate federal law.

In general, a trial court's evidentiary rulings are not proper grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief."). The Ninth Circuit

has held that the admission of "other acts" evidence violates due process only if there are no permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920.

Petitioner presented evidence that he was caring and protective of others. The jury could infer from Majors' testimony that this was not universally true. To the extent that Petitioner argues that Majors' testimony was unsubstantiated or inflammatory, she was subject to substantial cross examination by Petitioner's counsel. This Court cannot say that allowing the state to contradict Petitioner's mitigation through Majors' testimony rendered his trial fundamentally unfair.

Claim 20 is denied.

### 9. Claim 21

Petitioner asserts that Arizona's sentencing scheme "unconstitutionally creates a presumption of death and shifts the burden of proof to the defendant, violating his rights to due process, a fair trial, effective assistance of counsel, and freedom from cruel and unusual punishment." (Doc. 40 at 268.) Petitioner raised a majority of this claim on direct appeal. The Arizona Supreme Court concluded that "[a]lthough § 13–703(C) requires the defendant to prove mitigating circumstances by a preponderance of the evidence, the statutory scheme does not place any burden of proof on the defendant in connection with establishing that the mitigation evidence is sufficiently substantial to call for leniency." *Hampton*, 213 Ariz. at 180 ¶ 54, 140 P.3d at 963 (quoting *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 472 ¶ 14, 123 P.3d 662, 666 (2005)). The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established law.

The Supreme Court has rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty. *See Walton v. Arizona*, 497 U.S. 639, 651–52 (1990) (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990); *Boyde*, 494 U.S. at 370), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (summarily

rejecting a challenge to the "mandatory" quality of Arizona's death penalty statute and its failure to apply a beyond-a-reasonable-doubt standard).

Furthermore, the Supreme Court in *Walton* held that Arizona's allocation of the burdens of proof in a capital sentencing proceeding does not violate the constitution: "So long as a State's method of allocating the burdens of proof does not lessen the State's burden . . . to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 649–50.

Claim 21 is denied.

### 10. Claim 22

Petitioner next alleges that the "trial court improperly instructed jurors not to consider sympathy" in violation of his rights to "due process, equal protection, effective assistance of counsel, and a reliable sentence." (Doc. 40 at 273.) Petitioner raised a majority of this claim on direct appeal. The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

The trial court's reference to sympathy, bias, and prejudice, taken in context with the rest of the instructions, did not prevent the jury from considering or giving effect to any of Petitioner's mitigating evidence. The court properly defined mitigating circumstances without placing any limits on the jury's assessment of the evidence. *See Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("[O]ur precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."). The trial court's general instruction that jurors "should not be influenced by sympathy or prejudice," but rather should follow the law, including the court's definition of mitigation, was not unreasonable. (RT 1/16/03 at 132.)

Claim 22 is denied.

### 11. Claim 23

Petitioner asserts that "[t]he trial court's admission of victim impact testimony violated Mr. Hampton's right to [] due process, a fair trial, a reliable sentence, effective assistance of counsel, and freedom from cruel and unusual punishment." (Doc. 40 at 277.) Petitioner raised a majority of this claim on direct appeal. On direct appeal, the Arizona Supreme Court concluded that the victim impact statement presented by Findley's mother was not unduly prejudicial. *Hampton*, 213 Ariz. at 181 ¶ 62, 140 P.3d at 964. This conclusion was not contrary to or an unreasonable application of clearly established federal law.

The Supreme Court has held that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). The Eighth Amendment bars only "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *See Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016); *United States v. Mikhel*, 889 F.3d 1003, 1052–53 (9th Cir. 2018).

The Arizona Supreme Court's application of *Payne* was not unreasonable in this case. Petitioner complains primarily that Findley's mother referred repeatedly to "these people" who "weren't [Findley's] friends," "did get [Findley] into drugs," and "took advantage" of Findley. Findley's mother did not define who "these people" included, but presumably she intended to include Petitioner in this group that may have also included Ross, the state's primary witness, and Ramsdell, the other victim.

Although this testimony "characterized" Petitioner and others, as prohibited under *Payne*, Petitioner was not unduly prejudiced. *See United States v. Mitchell*, 502 F.3d 931, 990 (9th Cir. 2007) (concluding that a statement was "an inadmissible opinion about [the defendant's] crime," but denying relief because the comment "was brief, isolated, and could not have had more than a marginal impact on the jury"). The jury had already heard extensive testimony regarding the drug use and lifestyle in which Petitioner, the victims, and several other individuals engaged. The statements by Findley's mother were not

- 49 -

1    inconsistent with the information already before the jury regarding the circumstances
2    surrounding the crime and could not have significantly affected the jury's deliberations or
3    conclusion.
4            Petitioner further argues that another victim impact statement falsely stated that
5    Ramsdell had stopped taking drugs prior to her murder.  Even assuming this claim was not
6    defaulted, the statement does not violate *Payne*—it does not characterize Petitioner or offer
7    an opinion on the crime or sentence.
8            Claim 23 is denied.
9                            **12.    Claim 24**
10           Petitioner alleges that "by admitting gruesome photographs into evidence, the trial
11   court violated Mr. Hampton's constitutional right to due process, a fair trial, a reliable
12   sentence, effective assistance of counsel, and freedom from cruel and unusual
13   punishment."  (Doc. 40 at 273.)  Petitioner raised a majority of this claim on direct appeal.
14           When presented with this claim, the Arizona Supreme Court reasoned that "[o]n this
15   record, we cannot conclude that the judge abused his discretion by determining that the
16   probative value of the remaining photographs outweighed any danger of unfair prejudice."
17   *Hampton*, 213 Ariz. at 173 ¶ 20, 140 P.3d at 956.   This was not contrary to or an
18   unreasonable application of clearly established federal law.
19           The photographs at issue include photographs of both murder victims during their
20   autopsies as well as photographs of the deceased fetus.  Courts have repeatedly held that
21   the admission of highly inflammatory photographs does not inherently violate due process.
22   *See Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006) (noting the "very high standard for
23   proving a due process violation" based on the admission of photographs); *see, e.g.*,
24   *Plascencia v. Alameid*a, 467 F.3d 1190, 1203 (9th Cir. 2006) (premortem photographs of
25   the victim with her children); *United States v. Bowers*, 660 F.2d 527, 529–30 (5th Cir.
26   1981) (photograph of the child's lacerated heart).  It was not unreasonable for the Arizona
27   Supreme Court to conclude that the photographs, though "unsettling," were relevant to the
28   crimes charged.

Claim 24 is denied.

### 13.    Claim 25

Petitioner next argues that "[t]he imposition of a consecutive sentence violated Mr. Hampton's constitutional rights to due process and a reliable sentence." (Doc. 40 at 283.) Petitioner further alleges the denial of equal protection. (*Id.* at 284.) Petitioner did not present this claim as a violation of federal law in state court. (Doc. 51-1 at 117–18.) When Petitioner raised related violations of state law, the Arizona Supreme Court, interpreting A.R.S. §§ 13-116 and -1103(A)(5), concluded that the consecutive sentence was permissible as a matter of state law. *Hampton*, 213 Ariz. at 181–82 ¶¶ 63–65, 140 P.3d at 964–65. *Martinez* cannot excuse the procedural default of this claim. *See Pizzuto*, 783 F.3d at 1176–77.

Claim 25 is denied as procedurally defaulted.

### 14.    Claim 26

Petitioner alleges that "[t]he Arizona Supreme Court violated [his] right to trial by jury, due process, a reliable sentence, and freedom from cruel and unusual punishment" when it concluded that the trial court's failure to submit to the jury the aggravator on the manslaughter charge was harmless under *Blakely v. Washington*, 542 U.S. 296 (2004). (Doc. 40 at 285.) Petitioner presented this claim on direct appeal. The Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law.

The United States Supreme Court has stated that failure to send an aggravating factor to the jury is not structural error. *See Washington v. Recuenco*, 548 U.S. 212, 222 (2006). The Arizona Supreme Court's conclusion that the sentencing error in this case was harmless is not an unreasonable application of clearly established federal law.

*Blakely* error is structural if it "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Recuenco*, 548 U.S. at 218–19 (quoting *Neder v. United States*, 527 U.S. 1, 9 (1999)). In this case, the Arizona Supreme Court concluded that the trial court failed to allow the jury to make findings

regarding aggravation for the manslaughter charge. *Hampton*, 213 Ariz. at 183 ¶¶ 70–71, 140 P.3d at 966. It then concluded that this error was harmless because "no reasonable jury could have failed to find that a deadly weapon was used in the commission of the offense" and that "two other murders were committed at the same time as the fetal manslaughter." *Id.* at 183 ¶¶ 72–73, 140 P.3d at 966.

This conclusion was supported by the record and was not an unreasonable application of clearly established federal law or an unreasonable determination of fact. The use of a weapon and the number of deaths have never been disputed.

Claim 26 is denied.

### 15. Claim 27

Petitioner alleges that the Arizona Supreme Court erred by "reweigh[ing] the mitigation evidence against the remaining statutory aggravating factor and [upholding] the death sentence." (Doc. 40 at 287.) This claim was raised before the state PCR court, which rejected it on both procedural and substantive grounds. (Doc. 54-3 at 158–59.) Procedurally, the court concluded that "[t]his claim could have been raised in a motion for reconsideration to the Supreme Court and as it was not, it has been waived pursuant to Rule 32.2(a)(3)." (*Id.*) This independent and adequate state ground renders Petitioner's claim procedurally defaulted. *See Cook v. Schriro*, 538 F.3d 1000, 1025 (9th Cir. 2008).

Petitioner alleges he can overcome this procedural bar "because the ineffective assistance of post-conviction counsel—for failing to raise the ineffective assistance of appellate counsel—establishes good cause" under *Martinez*. The Court disagrees. *Martinez* has not been expanded to excuse the default of ineffective assistance of appellate counsel claims. *See Davila*, 137 S. Ct. at 2069 ("Extending *Martinez* to defaulted claims of ineffective assistance of appellate counsel would be especially troublesome because those claims could serve as the gateway to federal review of a host of trial errors, while *Martinez* covers only one trial error (ineffective assistance of trial counsel).").

Claim 27 remains procedurally defaulted and is denied. Petitioner's request for evidentiary development in support of this claim is also denied.

### 16.  Claim 28

Petitioner alleges that his direct appeal counsel was ineffective under *Strickland*. (Doc. 40 at 295.)  Petitioner asserts that competent counsel would have raised Claims 27, 5, 9, 29, and 39.  Petitioner presented only part of this claim to the Arizona Supreme Court. He alleged that his appellate counsel was ineffective for failing to pursue Claim 27 in a motion for reconsideration before the Arizona Supreme Court.  (Doc. 51-3 at 263–64.)  The remaining claims were not presented, and *Martinez* does not excuse their default.  *See Davila*, 137 S. Ct. at 2069 (declining to extend *Martinez* to defaulted claims of ineffective assistance of appellate counsel).

The Arizona Supreme Court denied review of this claim summarily, and thus this Court looks through to the last reasoned opinion, which was issued by the PCR court.  The PCR court concluded that Petitioner's appellate counsel was not ineffective because the underlying claim was without merit.  (Doc. 51-3 at 160.)  The court's decision was not contrary to or an unreasonable application of clearly established federal law.

To establish ineffective assistance of appellate counsel, a petitioner must satisfy the *Strickland* standard.  *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).  That is, petitioner must establish that appellate counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them," and "he must show a reasonable probability that, but for his counsel's unreasonable failure" to brief meritorious issues, "he would have prevailed on his appeal."  *Id.*  Counsel is not unreasonable for failing to raise a claim that lacks merit.  *See Sexton*, 679 F.3d at 1157.

When the PCR court considered the underlying claim—that the Arizona Supreme Court violated *Tennard v. Dretke*, 542 U.S. 274 (2004) by reweighing the mitigation and aggravating factors before upholding the death sentences—it concluded that the Supreme Court's decision to afford "little weight to the mitigation evidence" did not violate *Tennard*.  (Doc. 51-3 at 158–59.)

In *Tennard*, the Supreme Court emphasized that the trier of fact must be allowed to consider all evidence that is "of such a character that it might serve as a basis for a sentence

less than death." *Id.* at 287 (internal quotation marks omitted). The Court did not, however, ban the trier of fact from weighing the significance of mitigating evidence. *See id.* at 286 ("[G]ravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability.").

As the Arizona Supreme Court noted, "[t]he majority of the mitigation evidence detailed Hampton's very difficult personal and family history." *Hampton*, 213 Ariz. at 184 ¶ 82, 140 P.3d at 967. It deemed this evidence "not insubstantial" and acknowledged that Hampton "had a horrendous childhood." *Id.* at 185 ¶ 89, 140 P.3d at 968. The court then noted that this mitigation was "entitled to less weight" because it was not tied to the crime, and substantial time had passed between Petitioner's childhood and the crime. *Id.*

When articulating its evaluation of Petitioner's mitigating evidence, the Arizona Supreme Court used the same language approved by the Ninth Circuit:

> We do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence. . . . But the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence.

*McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (citation omitted) (quoting *State v. Newell*, 212 Ariz. 389, 132 P.3d 833, 849 (2006)). In sum, the PCR court was not unreasonable in concluding that Petitioner's *Tennard* claim was without merit.

Petitioner thus cannot show that his appellate counsel was unreasonable in failing to continue to pursue this claim before the Arizona Supreme Court, nor can he show that he was prejudiced.

Accordingly, Claim 29 is denied.

### 17. Claim 30

Petitioner asserts that the death penalty "is categorically cruel and unusual punishment in violation of the Eighth Amendment . . . ." (Doc. 40 at 303.) The Arizona Supreme Court's rejection of this claim is not contrary to or an unreasonable application of clearly established federal law.

The United States Supreme Court has rejected the argument that punishment of death is per se cruel and unusual. *Gregg v. Georgia*, 428 U.S. 153, 176–87 (1976) ("We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it*."); accord Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("[T]he death penalty is not invariably unconstitutional . . . .").

Claim 30 is denied.

**18.     Claim 31**

Petitioner alleges that Arizona's capital sentencing scheme "affords the prosecutor . . . unbridled discretion to seek the death penalty" and is thus unconstitutional.  (Doc. 40 at 305.)  The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

A statutory scheme for imposing a death sentence may not be capricious or arbitrary. *See Gregg*, 428 U.S. at 206; *Zant*, 462 U.S. at 877–79.  Accordingly the Supreme Court has consistently held that limits on the sentencer's discretion are necessary to prevent the capricious or arbitrary imposition of death sentences.  *Gregg*, 428 U.S. at 206–07 ("No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.").  No clearly established federal law, however, imposes similar limits on the prosecutor's discretion to seek death in the first instance.

Claim 31 is denied.

**19.     Claim 32**

Petitioner contends that the death penalty in Arizona is imposed in a discriminatory manner "against poor, young, and male defendants."  (Doc. 40 at 307.)  The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

"[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and a resulting "discriminatory effect."

*McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967) and *Wayte v. United States*, 470 U.S. 598, 608 (1985)).  To prevail on this claim Petitioner must therefore "prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.*  Petitioner does not offer evidence specific to his case that would support an inference that his sex or economic status played a part in his sentence.

Claim 32 is denied.

## 20.    Claim 33

Petitioner alleges that his death sentences are unconstitutional because he was not afforded the procedural safeguard of proportionality review.  (Doc. 40 at 309.)  The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

There is no federal constitutional right to proportionality review of a death sentence. *McCleskey*, 481 U.S. at 306 (1987) ("[W]here the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required." (citing *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984))); *see also Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996) ("Arizona's application of an adequately narrowed aggravating circumstance insured that Ceja's substantive right to be free from a disproportionate sentence was not violated.").  As explained further below, Arizona's death penalty scheme narrows the class of defendants eligible for the death penalty by defining narrow categories of aggravating circumstances, which in turn protect defendants' "substantive right to be free from a disproportionate sentence." *Ceja*, 97 F.3d at 1252.

Claim 33 is denied.

## 21.    Claim 34

Petitioner alleges that Arizona's capital sentencing scheme violates the Constitution "because it does not require the state to prove or the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances."  (Doc. 40 at 310.)  The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

The Supreme Court has held that "a State may require the defendant to bear the risk of nonpersuasion as to the existence of mitigating circumstances." *Delo v. Lashley*, 507 U.S. 272, 275 (1993) (per curiam) (internal quotation marks omitted); *see also Boyde v. California*, 494 U.S. 370, 377 (1990) ("Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances 'outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181(1988))); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard).

The Constitution thus does not require that the jury find beyond a reasonable doubt that aggravating circumstances "outweigh" mitigating circumstances.

Claim 34 is denied.

### 22.    Claims 35 and 36

In Claim 35 Petitioner alleges that "Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances." (Doc. 40 at 312.) In Claim 36, Petitioner similarly argues "Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not sufficiently channel the discretion of the sentencing authority." (*Id.* at 313.) The Arizona Supreme Court's rejection of these claims was not contrary to or an unreasonable application of clearly established federal law.

"The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California*, 512 U.S. 967,

973 (1994) (citing *Gregg*, 428 U.S. at 189). Procedures must "minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

Arizona's death penalty statute allows only certain, specific aggravating circumstances to be considered in determining eligibility for the death penalty. *See* A.R.S. § 13–703(F). "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencing authority]." *Blystone*, 494 U.S. at 306–07. In addition, Arizona's scheme requires the sentencing court to consider as mitigating circumstances "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." A.R.S. § 13–703(G).

Furthermore, rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers*, 497 U.S. 764, 774–77 (1990); *Walton*, 497 U.S. at 649–51; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272.

Because it provides for "categorical narrowing" at the definition stage and for an "individualized determination" at the selection stage, Arizona's death penalty scheme is not unconstitutional. The Arizona Supreme Court's rejection of these claims was neither contrary to nor an unreasonable application of federal law.

Claims 35 and 36 are denied.

### 23.    Claim 38

In Claim 38, Petitioner alleges he "will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments." (Doc. 40 at 317.) He acknowledges that "has not yet become ripe" but seeks to "avoid difficulties raising this claim in future

habeas proceedings." (*Id.*)  Habeas relief can only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a)*; see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law).

Claim 38 is denied as non-cognizable.

**IV.    CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could not debate its resolution of Petitioner's claims.

**V.    CONCLUSION**

Accordingly,

**IT IS ORDERED** denying the Petition (Doc. 40).  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** denying Petitioner's motion for evidentiary development (Doc. 73.)

**IT IS FURTHER ORDERED** denying the following motions as moot: Petitioner's Motions for New Counsel (Docs. 96, 99); Petitioner's Motion to Declare a Conflict of Interest (Doc. 97); and Petitioner's Motions for Order to Cease and Desist (Docs. 98, 101).

**IT IS FURTHER ORDERED** denying a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

Dated this 27th day of February, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge